---

DEPUTY MARSHAL (MEADE v.). See Case No. 9,372.

---

## Case No. 3,814.

### In re DE PUY.

[3 Ben. 307; 2 Am. Law T. Rep. U. S. Cts. 130; 10 Int. Rev. Rec. 34; 4 Am. Law Rev. 188; 16 Pittsb. Leg. J. 121.][1]

District Court, S. D. New York. June Term. 1869.

CONSTITUTIONAL LAW—POWER OF THE PRESIDENT—REVOCATION OF PARDON—DELIVERY—IMPRISONMENT FOR A YEAR OR LESS.

1. Under the constitution and laws of the United States, a pardon must be regarded as a deed, to the validity of which delivery is essential. A pardon differs in that respect from a commission.

2. Until a pardon is delivered, it may be revoked.

3. Under the 3d section of the act of March 3, 1863 (13 Stat. 500), a court of the United States has no right to order a person who is sentenced to imprisonment for a period of one year or less, to be confined in any particular state prison or penitentiary.

[Cited in Ex parte Brooks, 29 Fed. 85; Ex parte Waterman, 33 Fed. 31.]

4. A prisoner was sentenced to imprisonment for a year at Blackwell's Island, in pursuance of which the marshal delivered him into the custody of the keeper of the Blackwell's Island penitentiary: Held, that the sentence did not direct him to be imprisoned in any particular state prison or penitentiary. and that he was properly delivered to the custody of the keeper of the Blackwell's Island penitentiary, whether he was imprisoned by virtue of the direct sentence of the court, or by virtue of the rule of the circuit court on the subject. 4 Blatchf. 541.

5. Such prisoner was, under the act of congress of June 30, 1834 (4 Stat. 739), exclusively under the control of the officers having charge of such penitentiary.

6. A pardon for a prisoner so imprisoned was made out and signed by the outgoing president of the United States, on the 3d of March, 1869, and was transmitted on that day by the department of state to the marshal of the southern district of New York, and received by the marshal on the 5th of March, and, on the 6th of March, the incoming president directed the secretary of state to order the marshal, if the prisoner had not been released, to consider the pardon as cancelled, and to return the same, which the marshal did, and, on the 8th of March, the president signed an order, reciting that the pardon had not been delivered, and ordering that the pardon be revoked and withdrawn; and thereafter, on habeas corpus, directed to the warden of the penitentiary, the prisoner was brought before this court: Held, that the writ of habeas corpus was properly directed to the warden.

7. As the pardon had never been delivered to the warden, it had not been delivered to the

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 4 Am. Law Rev. 188, contains only a partial report.]

prisoner, and the incoming president had the power to cancel it, as the president who signed the pardon would have had.

Habeas corpus.

Edwards Pierrepont, Dist. Atty., for the United States.

Edwin W. Stoughton and Clarence A. Seward, for petitioner.

BLATCHFORD, District Judge. The petitioner, Moses De Puy, represents that he is restrained of his liberty by John Fitch, warden of the penitentiary at Blackwell's Island, within the southern district of New York; that the said John Fitch, warden, as aforesaid, claims to restrain the petitioner of his liberty, and to detain him at the penitentiary aforesaid, on the following grounds, namely, that, at the January term, 1869, of the circuit court of the United States for the southern district of New York, one Jacob De Puy and the petitioner were convicted of having rescued spirits from the custody of a revenue officer of the United States, in violation of the provisions of the internal revenue laws, and were sentenced as follows, namely, the said Jacob De Puy to imprisonment for two years, and to pay a fine of six hundred dollars, and the petitioner to one year's imprisonment, and to pay a fine of two dollars; that, in pursuance of said conviction and sentence, the petitioner was, on the 18th of February, 1869, taken to the penitentiary at Blackwell's Island, aforesaid, and has ever since that day been, and now still is, there confined, under the charge of John Fitch, the warden, as aforesaid; and that, on the 3d of March, 1869, the president of the United States, in pursuance of the authority vested in him by the constitution of the United States, granted to the said Jacob De Puy and the petitioner a pardon for the offences of which they respectively stood convicted, conditioned upon the payment by them of their respective fines so imposed on them by the sentence aforesaid. A copy of the pardon is annexed to the petition. It is stated, in the petition, that the pardon was duly signed by the president, was sealed with the great seal of the United States, and was countersigned by the secretary of state, and was duly forwarded by mail to the marshal of the southern district of New York, for and on behalf of the petitioner; and the petition refers, in that connection, to an affidavit which is annexed to it. That affidavit is made by one James M. Nelson, and states, that, on behalf of Jacob and Moses De Puy, he presented a petition for their pardon to the president of the United States; that, after considering the same, the president endorsed on the petition a direction that a pardon issue, and requested him, Nelson, to take the petition and endorsement to the attorney general: and that he took the petition to the attorney general's office, and left it with the attorney general, and received from the attorney general a letter to the secretary of state. That letter, also, is annexed to the petition. It is dated the 3d of March, 1869, and is signed by the attorney general, and is addressed to the secretary of state, and states, that the attorney general is directed by the president to request the secretary of state to issue a warrant for the pardon of Jacob De Puy and Moses De Puy, with certain recitals. Nelson further states, that he took that letter to the office of the secretary of state, and obtained from that office a pardon, ready for signature, and took the pardon to the president, and obtained his signature thereto, and then took it to the office of the secretary of state; that the secretary of state signed it, and directed his chief clerk to have the seal of the United States attached, and to have the pardon, and a letter in relation to it, sent to the marshal; that he, Nelson, asked the chief clerk of the department of state, whether he, Nelson, would not be permitted to take the pardon; that the chief clerk said, no, that it must be sent to the marshal, that that was the usual course of business in such cases, and that it would be forwarded immediately on its being finished; and that the pardon was subsequently forwarded by the state department to the marshal. The petition further states, that the marshal received the pardon, by due course of mail, on the 6th of March, but did not deliver it to the petitioner, and, on the contrary, detained it; that it has been the invariable custom of the executive of the United States, on granting a pardon, to cause it to be forwarded by mail to the marshal of the district in which the prisoner is confined; that such deposit in the mail is the only delivery recognized by the executive for the delivery of the pardon to the prisoner; that the marshal receives the same as agent for, and on behalf of, the prisoner, and in no other capacity; and that the marshal, in this case, received this pardon in compliance with said custom, and as the agent of the petitioner. The petition then alleges, that the petitioner, by virtue of the pardon so issued, was entitled to be set at liberty forthwith, and to be no longer restrained of his liberty, upon his paying the fine imposed on him by said sentence of conviction, and which fine, he states, has been duly paid by him to the clerk of the court before which he was convicted. He, therefore, prays for a writ of habeas corpus, directed to the warden of the penitentiary, commanding him to produce before this court the body of the petitioner.

The writ was issued, and the petitioner was brought before the court. At the same time the return was made by the warden to the writ. In the return the warden states, that he produces the body of the petitioner, and that the cause of his imprisonment appears by copies of two commitments annexed to the return. The first one of those commitments is an order made by the circuit court of the United States for this district, on

the 15th of February, 1869, entitled in the case of The United States v. Moses De Puy, and reading as follows: "On motion of the United States district attorney, ordered sentence. Thereupon, the court proceed to pass judgment, and sentence the prisoner, Moses De Puy, on the first count, to be imprisoned at Blackwell's Island for the term of six months, and to pay a fine of one dollar, and stand committed until paid; and, on the second count, to be imprisoned at Blackwell's Island for the term of six months and pay a fine of one dollar, and stand committed until paid—this sentence to commence on the termination of the first." The other commitment is a paper signed by the marshal of the United States for the southern district of New York, and dated February 18th, 1869, and entitled in the case of The United States v. Jacob De Puy and Moses De Puy, "charged with removing distilled spirits to other than a bonded warehouse." It reads as follows: "Jacob De Puy and Moses De Puy, defendants in the above-entitled cause, are delivered by me into the custody of the keeper of the Blackwell's Island penitentiary, in pursuance of the statutes in such cases made and provided." The return further states, that there is annexed thereto a true copy of the record of the proceedings and judgment in the circuit court of the United States for this district, upon which the said Moses De Puy was sentenced and is now imprisoned, being the same judgment that is contained in the order before referred to, of the 15th of February, 1869. By that record it appears, that Jacob De Puy and Moses De Puy were indicted in the said circuit court. The indictment contained four counts, upon the first and second of which the petitioner, Moses De Puy, appears to have been convicted and sentenced. Those two counts are identical, except that the first one alleges an offence committed on the 15th of May, 1868, and the second one an offence committed on the 16th of May, 1868, the offence set forth in each being the same, and being set forth in each in the same language—rescuing, and attempting to rescue, and aiding and assisting in rescuing, distilled spirits, in one case fifty barrels, and in the other case thirty-two barrels, from the custody of a revenue officer. The record shows, that both of the prisoners, Jacob De Puy and Moses De Puy, were arraigned on this indictment on the 26th of December, 1868, and pleaded to it not guilty, the indictment having been found on the 15th of December, 1868. On the 7th of January, 1869, as appears by the record, a trial was ordered on the indictment. On the 13th of January the jury found both of the prisoners guilty. On the 10th of February a motion for a new trial, which had been previously made, was denied, and judgment was ordered on the verdict, and, as before stated, the judgment and sentence were passed on Moses De Puy on the 15th of February. The return further states,

that the judgment and sentence have never been reversed, vacated or set aside, but still stand in full force and effect. The return also states, that no pardon for the said offence whereof Moses De Puy stands convicted and sentenced, according to the said record, has ever been issued or delivered to or for Moses De Puy, or to any one on his behalf.

The pardon, of which a copy is annexed to the petition, bears date on the 3d of March, 1869. It is in the form of letters patent, and commences with these words: "Andrew Johnson, President of the United States of America, to All to Whom These Presents shall Come, Greeting." It then recites, that, at the January term, 1869, of the United States circuit court for the southern district of New York, Jacob De Puy and Moses De Puy were convicted of having rescued spirits from the custody of a revenue officer of the Unites States, in violation of the provisions of the internal revenue laws, and sentenced as follows: Jacob De Puy to imprisonment for two years, and to pay a fine of six hundred dollars, and Moses De Puy to one year's imprisonment, and to pay a fine of two dollars. It then recites the considerations which moved the president to grant the pardon, and states that, in consideration of the premises, divers other good and sufficient reasons moving him thereunto, he grants to the said Jacob De Puy and Moses De Puy a pardon for the offences of which they stand convicted, conditioned upon the payment of their said fines. The pardon is signed by the president and the secretary of state, and bears the seal of the United States.

The return to the writ is traversed by the petitioner. The traverse states, that he denies that the judgment and sentence stand in full force and effect; that he denies the allegation, in the return, that no pardon of the offence whereof he was convicted and sentenced, according to the record annexed to the return, was issued or delivered to or for him, or to any one on his behalf; and that he avers and insists that a pardon for the offence of which he was convicted has been issued and delivered to him in the manner and form more fully and at large set forth in the petition.

Upon the issue of fact thus joined evidence was put in, consisting, mainly, of statements admitted by both parties to be correct. Among such evidence is a certified copy, from the records of the department of state, of what appears to be a record of the pardon, in the same words with the copy of the pardon that is annexed to the petition. It was also admitted by the district attorney, representing the United States, that the only conviction against Moses De Puy, and the only sentence passed upon him, were the conviction and sentence contained in the record attached to the return. It was also admitted by both parties, that the original of the par-

don was sent through the mail by the department of state, to the marshal of the United States for this district, enclosed in a letter, of which the following is a copy: "Department of State, Washington, 3d of March, 1869. Robert Murray, Esq., Marshal of the U. S. for the Southern District of New York. Sir: I transmit herewith the president's warrant for the conditional pardon of Jacob and Moses De Puy, the receipt of which you will please acknowledge. I am, sir, your obt. servant, F. W. Seward." It was also admitted, that the original pardon enclosed in that letter was received at the office of the marshal, in this city, on the 5th of March, 1869, with the letter; that numbers of pardons for persons convicted in the courts of the United States in this district had been previously received by the marshal at his office, from the department of state, with similar letters; that he usually gave or transmitted such pardons to the keepers of the prisons where the persons pardoned were confined; and that such pardons were usually received by the marshal by mail. It was also admitted, that, on the 6th of March, 1869, the president, by a verbal order, directed the secretary of state to send to the marshal of the southern district of New York a communication in relation to this pardon; that the secretary of state obeyed this verbal order, and transmitted to the marshal a telegraphic despatch, in the following words: "Washington, March 6th, 1869. To Robert Murray, U. S. Marshal: If Jacob and Moses De Puy have not been released, you will regard their pardon as cancelled, and will return the same to this department. E. B. Washburne, Secretary of State;" that the telegraphic despatch was received at the office of the marshal, in this city, on the same day, the 6th of March; that, on the same day, the original pardon, which still remained in the hands of the marshal, was put by him on the way of its return to the state department; and that it reached the state department thereafter. It was also admitted, on the hearing, that the president thereafter verbally directed the secretary of state to cancel the pardon, and never gave any other or further direction in regard to it. It was also understood, on the hearing, that communication was to be had with the department of state, for the purpose of learning what there was, if anything, on record there on the subject, that had transpired after the return of the pardon. In pursuance of such understanding, I have been furnished with a despatch from the second assistant secretary of state to the district attorney, in which he says, that there is on file in the department of state, an order signed by the president, dated the 8th of March, 1869, stating that, whereas the pardons in question have not been delivered to, and accepted by, the said Jacob and Moses De Puy, or either of them, it is ordered that the said pardons be, and the same are, revoked and withdrawn; and that nothing further has taken place in regard to the matter.

The fact was also put in evidence, that Moses De Puy, on the 12th of May, 1869, paid to the clerk of the circuit court the fine of two dollars imposed upon him by the sentence, and which he was required to pay as a condition of the pardon.

Various questions were discussed on the hearing, especially the question as to the correspondence of the terms of the pardon with the actual offences of which the petitioner was convicted and for which he was sentenced. I do not consider it important to consider that point. I assume that the pardon recites the offences properly.

The main ground upon which the discharge of the petitioner is claimed is, that the pardon was delivered to the marshal, and, being delivered to the marshal, was delivered to the petitioner; that the proceedings which took place were of such a character that the pardon was irrevocable; that the president had no authority or power to control the disposition to be made of the original paper in the hands of the marshal; and that the petitioner was entitled to the benefit of it, as a complete and full pardon.

I have given careful consideration to the questions raised in regard to this branch of the case, and have examined the authorities cited, and the statutes bearing on the subject, and have come to a conclusion satisfactory to my own mind. The question is an important one—a question of constitutional law, as to the proper construction of the powers of the president, under the constitution, in regard to pardons, and a question involving personal liberty; and for these reasons, and because I think it desirable that the true character of a pardon should be defined, I shall proceed to state, at considerable length, my views on the question, and the only question, which, it appears to me, is to be determined in this case, namely, whether this pardon was, or was not, actually delivered to the petitioner, in judgment of law.

It is contended, on the part of the petitioner, that, when this pardon received the signature of the president, and the seal of the department of state, it was a completed act, and passed beyond the control of the president. I think that is an entire mistake. The law undoubtedly is, that when a pardon is complete, there is no power to revoke it, any more than there is power to revoke any other completed act. And yet the question still remains—when is a pardon complete? It is argued, that a pardon stands on the same footing as a commission; and the doctrine of the case of Marbury v. Madison, 1 Cranch [5 U. S.] 137, is invoked in support of this view. The opinion of the court, in the case of Marbury v. Madison, was delivered in 1803, by Chief Justice Marshall, the same judge who, afterwards, in 1833, delivered the opinion of the same court, in the case of U. S. v. Wilson. 7 Pet. [32 U. S.] 150. In the case of Marbury v. Madison,

the president of the United States had nominated Marbury to the senate, for its advice and consent, to be appointed to the office of a justice of the peace of the District of Columbia. The senate advised and consented to the appointment. The president signed the commission appointing Marbury to be such officer, and the seal of the United States was, in due form, affixed to it by the secretary of state. Application was made to the secretary of state to deliver the commission to Marbury. It was not delivered, but was withheld. On that state of facts, the question came before the supreme court, as to whether Marbury was entitled to have his commission delivered to him, on the view that the delivery was a purely ministerial act, or whether there was any power on the part of the president, or of the secretary of state, to control the commission. The chief justice, in his opinion in the case, uses this language: "In order to determine whether he is entitled to this commission, it becomes necessary to inquire whether he has been appointed to the office. For, if he has been appointed, the law continues him in office for five years, and he is entitled to the possession of those evidences of office, which, being completed, became his property." He then shows, that the constitution and laws contemplate, in regard to offices, three distinct operations: 1st. The nomination, which "is the sole act of the president, and is completely voluntary;" 2d. The appointment, which "is also the act of the president, and is also a voluntary act, though it can only be performed by and with the advice and consent of the senate;" 3d. The commission. He then states, that, in the case before the court at that time, the appointment was made by the president, by and with the advice and consent of the senate, and was evidenced by no act but the commission itself; that the appointment, being the sole act of the president, was completely evidenced, when it was shown that the president had done everything to be performed by him; and that, even if the commission, instead of being evidence of an appointment, should be considered as constituting the appointment itself, still, the appointment would be made when the last act to be done by the president was performed, or, at farthest, when the commission was complete; that the last act to be done by the president was the signature of the commission; that he had then acted on the advice and consent of the senate to his own nomination; that the time for deliberation had then passed, and the president had decided; that his judgment on the advice and consent of the senate, concurring with his nomination, had been made, and the officer was appointed; that the appointment was evidenced by an open and unequivocal act; that this act, being the last act required from the person making it, necessarily excluded the idea of its being, so far as re-

spected the appointment, an inchoate and incomplete transaction; that the power of appointment was exercised when the last act required from the person possessing the power had been performed; and that the last act was the signature of the commission. He then goes on to say, that, when the seal was affixed, if the affixing of the seal was to be considered as necessary to the validity of the commission, the appointment was made, no farther act remaining to be performed on the part of the government. He then proceeds to consider the argument that was urged in reference to a commission —that it was like a deed, to the validity of which delivery was essential—and says: "It has been conjectured that the commission may have been assimilated to a deed, to the validity of which delivery is essential." On this subject, he comes to the conclusion, that, if the act of delivery was necessary to give validity to the commission, it was delivered when it was executed and given to the secretary of state for the purpose of being sealed, recorded, and transmitted to the party. But he holds that, in the case of a commission, a formal delivery to the person is not among the solemnities required as evidences of the validity of the instrument, and that only the sign manual of the president, and the seal of the United States, are those solemnities. He thus expressly puts a commission, as evidence of an appointment having been made to an office by the president and senate, on a totally different ground from an instrument which requires delivery, and holds that, when the appointment is made by the president, by and with the advice and consent of the senate, and the president has signed the commission, and the seal of the United States has been affixed to it, the president has done everything that he has any right to do in the premises; that his power then ceases; and that a delivery of the commission is not essential to the validity of the appointment. He then says: "If the transmission of a commission be not considered as necessary to give validity to an appointment, still less is its acceptance." He illustrates this view by the fact, that when a person appointed to any office refuses to accept it, the successor is nominated in the place of the person who has declined to accept, and not in the place of the person who had been previously in office, and had created the original vacancy.

I have gone thus, at some length, into the views of the chief justice, in the case of Marbury v. Madison [supra], for the purpose of showing, in contrast with these views on the subject of an appointment and a commission, that the same judge, in the same court, in delivering the judgment of the court, in the case of U. S. v. Wilson [supra], placed a pardon by the president on a totally different footing from that on which a commission was placed, in the case of Marbury v. Madison. In U. S. v. Wilson, the chief justice

says: "A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed. It is the private, though official, act of the executive magistrate, delivered to the individual for whose benefit it is intended. * * * A pardon is a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance." In the case of Marbury v. Madison, it was held, that a commission was not a deed, or assimilated to a deed, and that delivery was not essential to its validity. The two instruments are thus placed in as direct antagonism, on the question of the necessity of a delivery, as it is possible for the same court, speaking through the same distinguished jurist, to place two matters. It is manifest, therefore, that, under the constitution and laws of the United States, a pardon must be regarded as a deed, to the validity of which delivery is essential. It is, also, apparent, that the decision in the case of Marbury v. Madison furnishes no support to the views urged on the part of the petitioner.

The only question in this case is, whether this pardon was delivered, in the sense of the law, to the petitioner, or to any person for him. All that was done in regard to the pardon was, that the secretary of state transmitted it to the marshal, with a letter, stating: "I transmit herewith the president's warrant for the conditional pardon of Jacob and Moses De Puy, the receipt of which you will please acknowledge." In the case of Com. v. Halloway, 44 Pa. St. 210, a habeas corpus was issued to bring up the body of a prisoner who claimed to have been pardoned. The case was one before the full bench of the supreme court of Pennsylvania, the opinion of the court being delivered by Chief Justice Lowrie. In the opinion, the chief justice says: "There are charters or patents for new inventions, for lands, for grants of corporate privileges, and as commissioners of public affairs, as well as those of pardons; and, though all these have a strong likeness as to their form, and to the source whence they immediately proceed, yet they have also some marked points of unlikeness that warn us to be cautious about confounding the rules that belong to any one kind with those of another. We notice here only the distinction that is important for this case. With us, those that relate to new inventions, to lands, to corporate privileges, and to offices, are usually only the last step in the process by which certain rights become completely vested; and, when all preliminary steps are regular and complete, this last step becomes a mere ministerial duty, definitely prescribed by law, and the claimant has a right to demand that it shall be taken, because he has performed all the conditions upon which the law has made his title to it to depend." That was the case in

Marbury v. Madison, where the last step—the delivery of the commission—was a mere ministerial duty, the right to the office having previously become a vested right. He then goes on to say: "But charters of pardon are entirely different from these, in the conditions on which they depend; for, (not to speak of those which are issued in pursuance of promises, by proclamation or otherwise, of executive clemency,) they are forwarded on mere grace, and not at all on preliminary steps that furnish legal merits or a legal title to them. The intention of the executive to grant a pardon can have no legal force until carried into completed act. And his instructions to his proper officers, and their work in pursuance of his instructions, are only the means by which he embodies his intentions into the completed act, and have no force out of the executive sphere until thus completed, though the courts may, when the intention is satisfactorily shown, suspend further proceedings, in expectation of the actual pardon, as has been sometimes done in England. The completed act is the charter of pardon and delivered. This is the only step that gives title to a pardon. Until delivery, all that may have been done is mere matter of intended favor, and may be cancelled, to accord with a change of intention." He then discusses the question—"Was this pardon delivered?" It appeared that it had come to the hands of the warden of the prison; and the court says, that, "by usage, its delivery to the warden is prima facie equivalent to delivery, or is a constructive delivery, to the prisoner; but it is open to be proved no delivery, by showing circumstances that are inconsistent with the intention to deliver it."

In the present case, the petitioner was in the penitentiary on Blackwell's Island, under a sentence which directed him to be imprisoned at Blackwell's Island, in pursuance of which the marshal, by a written paper, delivered him into the custody of the keeper of such penitentiary. By the 3d section of the act of March 3, 1863 (13 Stat. 500), it is provided, "that, in every case where any person convicted of any offence against the United States shall be sentenced to imprisonment for a period longer than one year, it shall be lawful for the court by which the sentence is passed, to order the same to be executed in any state prison or penitentiary within the district or state where such court is held, the use of which prison or penitentiary is allowed by the legislature of such state for such purposes; and the expenses attendant upon the execution of such sentence shall be paid by the United States." Under that provision of law, a court of the United States has no right to order a person who is sentenced to imprisonment for a period of one year, or less, to be confined in any particular state prison or penitentiary. The sentence in the case of the petitioner being, taking together the two terms of six

months each, not longer than one year, the court had no right to order the petitioner to be imprisoned in any particular state prison or penitentiary. Nor does the sentence, in terms, order him to be imprisoned in any particular state prison or penitentiary. It merely orders him to be imprisoned at Blackwell's Island. In pursuance of that order, the marshal delivered him into the custody of the keeper of the Blackwell's Island penitentiary. By a rule made by the circuit court for this district, on the 4th of March, 1840 (4 Blatchf. 541), it is provided, that, in all cases in which persons convicted of offences against the statutes of the United States, shall be sentenced to imprisonment, and the sentence shall not also specify that the party shall be kept at hard labor, it shall be the duty of the marshal to cause such party to be imprisoned in any one of the prisons within the city and county of New York, which he may select for the purpose. Now, in this case, whether the sentence which orders the petitioner to be imprisoned at Blackwell's Island, be considered as a sentence that he be imprisoned in the penitentiary at Blackwell's Island, or whether the portion of the sentence which refers to Blackwell's Island be considered as surplusage, or as void, so that the case would fall under the rule of court, of March, 1840, the sentence not specifying that the petitioner shall be kept at hard labor, and the marshal having had a right to cause the petitioner to be imprisoned in any one of the prisons within the city and county of New York, which he should choose to select for the purpose, and the penitentiary at Blackwell's Island being within the city and county of New York—in either view, the petitioner was properly imprisoned in the penitentiary at Blackwell's Island. Whether he was to be imprisoned there by virtue of the direct sentence of the court, or whether he was to be imprisoned there under the rule of court, of March, 1840, the marshal acted properly in delivering him into the custody of the keeper of the Blackwell's Island penitentiary.

There is also an act of congress, passed on the 30th of June, 1834 (4 Stat. 739), which provides, "that, whenever any criminal, convicted of any offence against the United States, shall be imprisoned, in pursuance of such conviction, and of the sentence thereupon, in the prison or penitentiary of any state or territory, such criminal shall, in all respects, be subject to the same discipline and treatment as convicts sentenced by the courts of the state or territory in which such prison or penitentiary is situated; and, while so confined therein, shall also be exclusively under the control of the officers having charge of the same, under the laws of the said state or territory." The petitioner being lawfully in the penitentiary at Blackwell's Island, in any view, in pursuance of his conviction and sentence, he was, by virtue of the act of 1834, exclusively under the control of the officers having charge of such penitentiary, under the laws of the state. So long as this delivery into the custody of the warden of the penitentiary remained in force, the marshal had no control over the petitioner, and no power to remove him from the penitentiary. The writ of habeas corpus, in this case, was, therefore, properly directed to the warden of the penitentiary, because the petitioner was, by virtue of the act of 1834, exclusively under the control of such warden. Under that state of facts, the question arises, whether, when a prisoner is exclusively under the control of the warden of a prison—even though it may not be necessary to deliver a pardon to the prisoner himself, and even though the delivery of a pardon to the warden of the prison, who has the exclusive custody and control of the prisoner, may be equivalent to a delivery to the prisoner—whether a delivery of a pardon to any other person, before it reaches the warden of the prison, is equivalent to a delivery to the warden of the prison. This question must be answered in the negative, not only on general principles, but on the evidence in this case. It appears, that the marshal usually gave or transmitted the pardons which he received from the department of the state, to the keepers of the prisons where the prisoners pardoned were confined. Why were the pardons sent to the keepers of the prisons? Undoubtedly, because, under the act of 1834, the prisoners were and are in the custody of the keepers of the prisons, and not in the custody of the marshal. The marshal, having no power to take a prisoner out of prison, cannot go to the prison with a pardon and take the prisoner out, retaining the pardon himself; and the fact, that the marshal has always been in the habit of giving or sending pardons to the keepers of prisons, serves to show conclusively that the delivery of a pardon, in order to be effective, must be, at least, a delivery to the keeper of the prison.

The marshal was, in this case, no more than the messenger of the president. If the president had sent the pardon by a special messenger, and had directed him to go to the warden of the Blackwell's Island penitentiary, and to deliver the pardon to him, and had despatched the messenger on his way, it cannot be questioned that the president could, by a telegraphic despatch, or any other communication, to the messenger, while on his way, have lawfully directed the messenger not to deliver the pardon to the warden. If the president can arrest the mission of the messenger when the messenger has departed but ten feet from the door of the presidential mansion, he can arrest such mission at any time before the messenger delivers the pardon to the warden of the prison.

No question arises, in this case, concerning any right or power, on the part of the presi-

dent, to revoke or recall a completed pardon. In the language of Chief Justice Lowrie, before cited, "the completed act is the charter of pardon and delivered. This is the one and only step that gives title to a pardon. Until delivery, all that may have been done is mere matter of intended favor, and may be cancelled, to accord with a change of intention."

The point urged, on behalf of the petitioner, that the pardon was signed by President Johnson, and was sealed during his administration of the executive office, and that the order to the marshal to return the pardon to the department of state was made by his successor, President Grant, is of no force. The office of president did not die when President Johnson gave place to President Grant. The power of pardon is conferred by the constitution upon the office of president. The president who signed the pardon in this case would have had precisely the same right which I think his successor had, to arrest the pardon before it was delivered to the warden of the prison; and the successor had the same right in that respect as his predecessor would have had. I place my decision, in this case, solely on the ground that there never was any delivery of the pardon to the petitioner, or to any one for him. There never was any completed pardon. It has not been contended, on the part of the United States, that the president has power to annul, or withdraw, or cancel a completed pardon.

In connection with the fact that the pardon was never delivered to the petitioner, or to any one for him, there is one circumstance that is worthy of observation, and that is, that Nelson, the person who went to Washington to procure this pardon, asked to have it delivered to him, and was refused, it being stated to him by the chief clerk of the department of state, that the pardon must be sent to the marshal. That was equivalent to a declaration by the executive authority of the United States, that the benefit of a locus penitentiae was claimed. If the pardon had been delivered to Nelson, for the petitioner, the case might, perhaps, have been different. I do not say that it would; but the circumstance that a request to deliver the pardon to a person claiming to be the agent of the petitioner was refused, is worthy of consideration. The executive authority plainly said to Nelson, that it would not transmit this pardon by him, as the messenger of the petitioner, but would transmit it by its own messenger.

Upon the ground that there was no delivery of the pardon in this case to the petitioner, or to any one for him, or to the warden of the prison, who, by act of congress, had the exclusive control and custody of the petitioner, I hold that the petitioner is not entitled to be discharged, and that he must be remanded to the custody of the warden of the penitentiary at Blackwell's Island.