## EX PARTE ELBERT MUNCY.

No. 2687.  Decided November 5, 1913.

Rehearing denied January 21, 1914.

**1.—Contempt—Witness—Immunity—Case Stated—Witness.**

Where the relator was extended and accepted immunity and testified for the State before the grand jury, and was never charged by complaint or otherwise with the offense concerning which he was to testify, but when the habeas corpus trial was called he refused to testify, although the district attorney and the district judge presiding· at the trial promised him absolute immunity from punishment and prosecution for said offense, there was no error in committing such witness to jail for contempt after a refusal by him to testify for the State under such circumstances.  Following Floyd v. State, 7 Texas, 215, and other cases.  Davidson, Judge, dissenting.

**2.—Same—Rule Stated—Election by State.**

Where a witness who has been given and accepted immunity under an agreement with the State approved by the trial judge refuses to testify for the State, he can be compelled to do so, and in default held for contempt, and this although the State could proceed to prosecute relator if it desired to do· so.

**3.—Same—Immunity—Constitutional Inhibition.**

Where a witness has been given complete immunity from punishment for the offense about which he is to testify for the State, he is thereby absolutely protected and the constitutional inhibition that he can not be forced to testify against himself has no application any more than if he had been tried and acquitted or the offense was barred by the statute of limitation.  Davidson, Judge, dissenting.

**4.—Same—Power to Give Immunity—District Judge—District Attorney.**

The district judge and district attorney have the authority and power under our law to guarantee and give to a witness who testifies for the State immunity from prosecution of the offense about which he is to testify.  Following Barrara v. State, 42 Texas, 260, and other cases.

**5.—Same—Rule Stated—Absolute Immunity—Witness.**

If complete and absolute° immunity from punishment is extended and accepted by the witness concerning the offense about which he is to testify for the State, and he afterwards refuses to do so, he may be compelled to testify under contempt proceedings.  Davidson, Judge, dissenting.

**6.—Same—Rule Stated—In this and Other States—Immunity.**

While it is the right of an individual under the Constitution to refuse to give testimony incriminating himself, yet where he is extended and has accepted immunity from punishment, the interests of the State and society demand that he shall give such testimony within his knowledge as will aid in bringing criminals to justice.  This is not only the rule in this State, but in other States.

**7.—Same—Practice on Appeal—Other Offenses Not Included.**

The fact that on the trial the relator may not testify truthfully and thereby become subject to a prosecution for perjury need not be considered, as the immunity extends simply to the offense about which he is to testify.

**8.—Same—Accomplice—Accessory—Principal—Immunity Extends to All.**

Under an agreement of immunity duly extended, the same covers any connected offense such as accomplice and accessory which in good faith he discloses as a part of the one to which he was admitted as a witness, although in truth the transaction constitutes a separate crime, but not two distinct offenses.  Following Young v. State, 45 Texas Crim. Rep., 202, and other cases.

**9.—Same—Statement in Opinion—Practice on Appeal.**

The contention that the statement of this court in the original opinion was not correct is not borne out by the record; however, as relator was given immunity in the habeas corpus trial by the district attorney and district judge, this question becomes immaterial.

**10.—Same—Statement of Facts in Opinion—Case Pending.**

The statement by this court that there is no case pending against relator is borne out by the record, and, therefore, can not be assailed.

**11.—Same—Authority to Give Immunity—District Court.**

Under the Code of Criminal Procedure the district judge and district attorney are authorized to grant and give complete immunity from punishment to a witness who testifies for the State, and the witness can be compelled to testify. Following Camron v. State, 32 Texas Crim. Rep., 180. Overruling Holmes v. State, 20 Texas Crim. App., 509. Distinguishing Snodgrass v. State, 67 Texas Crim. Rep., 615, 150 S. W. Rep., 162. Davidson, Judge, dissenting.

**12.—Same—Inherent Power of Courts—Immunity—Suspension of Laws.**

The courts have no inherent power to grant immunity, but they are given this power by the laws enacted by the Legislature and under the decisions of this court, and such power can not be construed to give the courts authority to suspend the laws of the State. Articles 37, 630, and 790, White's Ann. Code Criminal Procedure.

From Floyd County.

Original habeas corpus proceeding asking release from commitment to jail for contempt, in refusing to testify for the State.

The opinion states the case.

*L. C. Penry* and *Martin & Zimmerman,* for relator.—The Constitution of Texas having vested pardoning power in the executive department of the government, and the right to define crime, prescribe punishment therefor, and repeal law relating thereto, in the legislative department of the government only, the exercise by the court of the power and right to grant immunity and wipe out all offenses against a witness, is a transgression by the judicial department of the government, both upon the executive and legislative departments, contrary to article 1, section 2 of the Constitution of Texas.

A careful review of the authorities upon this question will show that in England, as well as in this country, it has always been conceded that the granting of immunity from prosecution was a right properly belonging to the executive department of the government, and that the courts of the several States came finally to the conclusion that the prosecuting attorney, with the advice and consent of the court, could grant immunity *with the consent* of the party to be affected, largely upon grounds of expediency, without denying the correctness of the principle announced by all earlier law writers that such a power belonged only in the executive department of the government. A very careful review of the authorities will demonstrate this. 1 Greenleaf on Evidence, sec. 379, lays down the proposition, "If an accomplice having made a private confession, upon *promise of pardon* by the Attorney-General, should

afterwards refuse to testify, he may be convicted upon the evidence of 'that confession." In Commonwealth v. Knapp, 10 Pick., 478, it is stated that in England, if a witness for the crown conducts himself fairly and makes and testifies to a full disclosure, he is recommended to mercy and a *pardon* is always granted.

When there has been a promise of immunity and the prosecuting attorney refuses to recognize it, the court will simply continue the case to permit him to apply to the executive department for a pardon. 1 Bishop's Criminal Procedure, sec. 1164. In the case of U. S. v. Ford, 99 U. S., 594, 25 Led., 399, it was held that the defendant could not plead a contract of immunity in bar of prosecution, his remedy being only to have case postponed to give opportunity to apply to pardoning power for executive clemency.

In the Hardin case, 12 Texas Crim. App., 189, in a similar case to the one at bar, Judge Hurt uses the following language: "The great weight of authority is to the effect that the defendant must look to executive clemency in such cases." Judge Wilson, in the Holmes case, 20 Texas Crim. App., 518, expresses doubt that the court may grant immunity, because such matters may be entertained only by the pardoning powers. The case of Camron v. State, 22 S. W. Rep., 682, is a case upon which the doctrine invoked by the State in this case must of necessity rest, as will be shown hereafter, because expressions found in both the Hughes case and the Napolean case hereafter mentioned are based upon this case as authority, but it will be noted that while the Holmes case is in some effects disapproved, the principle of law enunciated therein, towit, that the granting of immunity to a prisoner belonged solely to the pardoning power, was not disapproved. The court in the Camron case bases its decision upon a question of expediency, as shown by the following expression contained therein: "We can see no good reason why, when a defendant has in good faith carried out his agreement, the labor and expense of the State of a solemn trial should be incurred for the purpose of remitting the defendant to his remedy of pardon, *to which it is admitted he is entitled as a matter of right.* It is seen therefore that Judge Simkins, in disposing of the matter, finally rested upon the proposition that, it would be useless to put the defendant to the trouble and the State to the expense of a trial, in order to secure a right to which he was enitled.

Following the Camron case comes the Parks case, 40 S. W. Rep., 301, upon which the Napolean case, 144 S. W. Rep., 268, is based. It will be noted that the Parks case is based upon the Camron case above referred to, the Neeley case, 11 S. W. Rep., 376, and the Flemming case, 12 S. W. Rep., 605. So, if there is any law in Texas authorizing the procedure taken in this case, it will be found in the three last mentioned cases; but in each of these cases it will be seen that there was an agreement upon the part of the witness to testify, and in none of them was immunity attempted to be thrust upon the witness as in this case. The three above mentioned cases follow closely in point of time the expres-

sions above quoted in the earlier decisions, the court having finally come reluctantly to the view that the judicial department of the government could exercise the right to grant immunity solely and only because it was a right to which he was entitled anyway, upon application to the executive department, and each and all being cases in which there was an agreement upon the part of the State to grant immunity in consideration of the witness giving testimony fully and fairly to the facts within his knowledge.

If it is doubtful, as above shown, that the courts have power to grant immunity, with the consent of the defendant, what could be said of the right of a court to pardon a defendant and repeal absolutely all the State law applying to his offense, against his consent? Again, if the Camron, Neeley and Flemming cases furnish authority for the action of the court in this case, they also furnish authority for the rule of law that a person who fails to testify fully and fairly to the facts within his knowledge may be thereafter prosecuted. See Nicks v. State, 48 S. W. Rep., 186; Neeley v. State, 11 S. W. Rep., 376; Tullis v. State, 52 S. W. Rep., 83, and authorities there cited, and it must be conceded that under these authorities the State would hereafter have the right to prosecute the relator, if he hereafter refused to testify fully and fairly to the facts within his knowledge; and that he could not claim immunity unless his disclosures were full and fair as to all facts within his knowledge; and consequently if relator is compelled to testify in this case and if hereafter his testimony does not suit the prosecuting attorney, by reason of his having failed to comply with above conditions, he could then be prosecuted and the offense would therefore be suspended during the intervening time, and we are therefore driven to this:

That a power vested in the District Courts to thrust immunity upon a witness and compel his testimony, would amount to a delegation of authority to them to suspend the laws of the State as to such offenses, pending the giving of his testimony, contrary to section 28 of the Bill of Rights.

Either the State is utterly without a remedy, in the event the relator hereafter fails to testify fully and fairly as to the facts within his knowledge, or he may be prosecuted under the principles announced in the above cases, which support the fabric of the State's contention and are the foundation stones upon which its theory is built, giving the court the right of granting immunity; and in the event it is conceded that he may be hereafter prosecuted, the conclusion is irresistible that this case would then come squarely within the principle announced in the case of Ex parte Smythe, 120 S. W. Rep., 200, in which it was held that the wife abandonment law was unconstitutional, because it authorized the court to suspend punishment in violation of section 28 of the Bill of Rights. In other words, the court would be authorized, against the consent of the defendant, as he was under the wife abandonment law, to hold the offense over him pending the giving of full and fair testimony.

Again, if the State in this case, can thrust immunity upon relator

against his consent, compel his testimony and could under any circumstances hereafter prosecute him for any offenses growing out of, incident to or connected with the murder of J. M. Muncey, we would be driven to this:

Such a power vested in the District Courts would give them the right to deprive the defendant of his constitutional right to a speedy trial.

In the case of Waldon v. State, 98 S. W. Rep., 848, it was held that the Acts of the Twenty-eighth Legislature, 136, suspending prosecution in a seduction case for two years, upon certain conditions, was unconstitutional because it deprived the defendant of a speedy public trial. Now, if the relator has immunity thrust upon him upon condition that he testify fairly, his case comes squarely within the principle of law announced in the Waldon case, supra; and if any offense against him can be suspended and held over him upon such condition as this, it might be upon any other condition.

If the State replies that he is under no indictment or accusation of any kind, and hence the above argument is not applicable, we answer that section 10 of the Bill of Rights, providing that no person shall be compelled to give evidence against himself, has reference to possible and prospective prosecutions, as well as to present and existing ones, and the protection offered by it is not limited to cases in which the party called as a witness has been in some manner legally accused of crime. See Ex parte Carter, 166 Mo., 604; Counselman v. Hitchcock, 142 U. S., 547; 35 Led., 1110, and Ex parte Parks, 40 S. W. Rep., 300.

The language of the Constitution is plain and unequivocal, section 10 of the Bill of Rights providing, "that no person shall be compelled to give evidence against himself." Certainly this plain provision of the Constitution ought not to be abrogated and destroyed by reading into the statute law of the State a meaning that at the very most it only impliedly conveys. Articles 37, 630 and 709 of the Code of Criminal Procedure of 1895 are the only expressions contained in legislative enactments of the State of Texas that can possibly be construed into granting the courts of Texas the right to thrust immunity upon a witness and compel his testimony, and such provisions can not be said to be express authority for it, and at best can be only vaguely implied.

We have found no case sustaining the State's theory, but we find the following cases, that exactly decide the point in our favor, and seem to be decisive of the question that the court is without power to thrust immunity upon a witness. Ex parte Irvine, 75 Fed. Rep., 954; Foot v. Buchanan, 113 Fed. Rep., 156; Temple v. Commonwealth, 75 Va., 892; Rex v. England, 2 Leach C. C., 767. See also: Stanford v. State, 42 Texas Crim. Rep., 343; Mueller v. State, 79 Tenn. (11 Lea), 18. For full annotation of authorities, see State v. Jack, A. & E. Am. Cases, vol. 2, p. 177. See also following English and Canadian cases, holding that the privilege of a witness to refuse to give incriminating testimony, may be taken away by a *statute clearly intended to have that effect.* England:

24 and 25 Vict. C., 96, secs. 75-84; 26 and 27 Vict. C., 119, sec. 5; Reg. v. Scott, 7 Cox C. C., 164; Reg. v. Cross, 7 Cox C. C., 226; Ex parte Scho-field, 6 Ch. D., 230; Reg. v. Cherry, 12 Cox C. C., 32. Canada: Reg. v. McLineby, 2 Can. Crim. Cases, 416; Reg. v. Hammond, 29 Ont., 211; Reg. v. Fee, 13 Ont., 590.

This question has certainly not been decided in Texas adversely to our contention, unless it can be said that the views expressed in the Hughes case, 136 S. W. Rep., 1071, and the Napolean case, supra, so hold, and in each and both of these cases this exact question was not before the trial court, and could not have been properly before the appellate court for a decision, and any expression contained in these cases would therefore be orbiter dicta, and certainly neither of these cases could be properly based upon the Parks case, the Neeley and Camron cases, supra, because these cases, upon careful analysis, will be found to be against the con-tention of the State, rather than for it, and certainly not decisive that the courts of Texas can pardon a witness, can virtually repeal the laws with reference to any offense he may have committed, conditioned upon his testifying fully and fairly. We do not believe this court intended to so decide.

We submit and earnestly insist that the legislative department of this Government has been vested with the power alone to define and prescribe punishment for offenses and to repeal laws relating thereto, and in numerous cases where the Legislature has attempted to take away from the witness his constitutional right of testifying against himself, the courts have uniformly held that before the Legislature had power to do so, such witness must be protected by a statute that was as broad as his constitutional guaranty of silence. See following cases: People ex rel. Lemsolm v. O'Brien, 176 N. Y., 253; Ex parte Clarke, 103 Cal., 352; People ex rel. Akin v. Butler St. Foundry & Iron Co., 201 Ill., 236; Samson v. Boyden, 160 Ill., 613; Ex parte Carter, 66 S. W. Rep., 540; Counselman v. Hitchcock, 142 U. S., 547; State v. Nowell, 58 N. H., 314; Re Scott, 95 Fed., 815; Re Rosser, 96 Fed., 305; Re Feldstein, 103 Fed., 269; Re Walch, 104 Fed., 518; Re Shera, 114 Fed., 207.

Briefly reviewing the authorities showing it has never been the recog-nized rule, that immunity can be thrust upon a witness, except with his consent, we note the following: The Barara case, supra, was the case of a contract presupposing consent. The Bowden case was likewise a con-tract, in which the proposition was laid down that a case could be dis-missed and the defendant's testimony *used with his consent* and the further expression therein made that the effect of the nolle prosequi would be different without it, and that he is amenable to any indictment in any court having jurisdiction of the offense. The next case is the Hardin case, in which Judge Hurt expresses the opinion that the great weight of authority was to the effect that "immunity could be granted only by the pardoning power," and rests his opinion upon the doctrine of estoppel against the State, and not upon the court's right to give immunity. The next is the Holmes case, supra, in which Judge Wilson

denied the right of the court to even contract immunity. The next case is the Camron case by Simkins, who impliedly admits the correctness of the Holmes case, but says there is no use to put the defendant to the trouble and the State to the expense of a trial merely for the purpose of remitting the defendant to his remedy of pardon, to which he is always entitled, and this was a case of a contract which he agrees carried with it the idea of consent. About the next case is the Parks case in an opinion by Judge Henderson, where the relator was discharged because it appeared that upon cross-examination the witness might have to incriminate himself. The next case is the Stanford case by Judge Davidson, in which the right of the court to force a witness to testify upon granting him immunity, was expressly denied and which opinion was concurred in by Henderson and Brooks. This case was decided many years before the Hughes or Napolean case, and to our mind follows the principles announced in the Bowden and Camron cases, supra. We don't think the court has grasped the distinction which we have attempted to draw between the right of the court to make a contract with the consent of the witness, and their inherent right under the Constitution and laws to force testimony by the use of the dungeon or jail. In the former, there would not be necessity for positive statutory law, because the defendant could naturally do away with or waive his right; in the latter, the courts are attempting to take away a right guaranteed him by the State and Federal Constitution, and this naturally presupposes an absolute right in the court to perform that identical act derived from the organic law of the State.

All the authorities hold that a contract for immunity by the court merely suspends the offense, that he can be thereafter prosecuted; that the offense is alive all the time; that it has never been obliterated, else how could he thereafter be prosecuted, as stated in the Neeley and Greenhaw cases. This amounts in effect to a suspension of the laws of the State, which might be done with the consent of the defendant, but certainly could not be done against his consent, without violating section 28 of the Bill of Rights, providing that no law should be suspended, and which was applied in the Smythe case, 120 S. W. Rep., 200. For this very reason, the defendant can at any time withdraw from the contract, and the only remedy of the State is to prosecute. The promise operates against the State by way of estoppel, but the court has not the inherent right to hold a case over a defendant year in and year out and deny him a speedy public trial against his consent.

In the well considered case of Ex parte Carter, 66 S. W. Rep., 542, in discussing the clause of the Constitution protecting a witness from incriminating himself, the following language is used: "Referring to the expression, 'or furnish evidence against himself,' the opinion says this clause can be equally extensive in its application, and in its interpretation may be presumed to be intended to add something to the significance of that which precedes. Aside from this consideration, and upon the language of the proposition standing by itself, it is a reasonable con-

struction to hold that it protects a person from being compelled to disclose the circumstances of his offense, the sources from which or the means by which evidence of its commission, or if his connection with it, may be obtained or made effectual for his conviction, without using the answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transaction, the instrument by which a crime was perpetrated, or even the corpus delicti itself." Ex parte Greenhaw v. State, 53 S. W. Rep., 1024; Ex parte Gibson, 62 S. W. Rep., 755; Ex parte Carter, 62 Texas Crim. Rep., 113, 136 S. W. Rep., 778; Oates v. State, 86 S. W. Rep., 769, and cases stated in the minority motion.

C. E. *Lane,* Assistant Attorney-General, and *Crudington & Works,* for the State. Cases cited in opinion.

HARPER, JUDGE.—Relator was called as a witness before the grand jury of Floyd County, Texas, when said body was examining witnesses in regard to the killing of J. M. Muncy. The relator is a boy twelve years of age, and is the son of J. M. Muncy, deceased, and Mrs. Bertie Muncy, and on his testimony and the testimony of other witnesses Mrs. Bertie Muncy and Horace Peters were indicted charged with the murder of J. M. Muncy.

Mrs. Muncy and Horace Peters sued out a writ of habeas corpus, and on this hearing relator was offered as a witness by the State, and refused to testify on the ground that any testimony he might give might incriminate him. The district attorney in open court stated that he would agree that relator should not be prosecuted for any offense growing out of the killing of J. M. Muncy, and L. S. Kinder, judge of the Sixty-fourth Judicial District Court, acquiesced and approved said offer of immunity from prosecution, and informed relator that he would not be prosecuted for any offense growing out of the killing of his father, but the witness still refused to testify, when the court entered an order adjudging relator guilty of contempt, the order being as follows:

"And the said witness refused to answer any and all questions, and gave, while on the stand, and in open court, his reason for his refusal to answer said question that it would incriminate him, and the State, by its counsel in open court promised the said witness immunity from prosecution and punishment for said offense, and said promise was acquiesced in by the court, and the said witness was assured of immunity from prosecution for said offense, and it appearing to the court that there is no indictment or complaint or prosecution of any kind pending against said witness, and the court thereupon being of the opinion that the questions propounded would not incriminate the witness, and the said witness having been promised immunity from prosecution, and he having

agreed with the district attorney to testify herein, upon said promise of immunity, it is therefore ordered and adjudged by the court that said witness is in contempt of court for his refusal to answer said questions, and it is further the order, judgment and decree of the court that he, the said Elbert Muncy, be confined in jail of Floyd County, Texas, until he shall answer said questions, and it is therefore ordered by the court that the said witness, Elbert Muncy, be and he is hereby remanded to the custody of the sheriff of said Floyd County, Texas, until he shall answer said questions and testify as a witness in said causes."

It is thus seen that when relator was called before the grand jury he was offered immunity and accepted same, and did testify before the grand jury, a sworn statement of such testimony being incorporated in the record, and is as follows:

"About a week ago, I heard Horace Peters tell mama she ought to kill my papa. Yesterday evening mama said would I kill papa. I told her I would kill him if I could, but I was too nervous. While papa was gone to town, mama said she might kill papa if she could. Yesterday evening I told mama I would say I shot papa. I got up this morning and went out to the closet and told them the horse was out in the yard. Papa said 'let him go.' As I came in, mama stepped out on the floor. I lay down on the bed. I then heard the pistol shot or fire. I then heard it fall on the floor. I went out and told Judge Stalbird I did it, and when I told you all I killed him I did it to save my mama."

After being remanded to jail for refusing to testify on the habeas corpus trial, relator sued out a writ of habeas corpus, which was granted by Judge Davidson, and the cause set for hearing on the 8th day of October, it being the first day set for hearing of causes at this term of court. At the hearing of the case the testimony offered was substantially as above, the relator claiming that he could not be forced to testify as section 10 of the Bill of Rights provides that no person shall be compelled to testify against himself. There is and can be no question that no person can be compelled to testify in a .criminal case pending against him, nor give testimony on the trial of another on which a prosecution may or can be founded against him. To this expression of the law we give our full assent and approve what is said in the case of Ex parte Wilson, 47 S. W. Rep., 996, cited by relator, but in that case no immunity was tendered, offered nor accepted. A different question arises here, and that is, after giving the witness immunity from prosecution, was the court attempting to force the witness to testify in regard to any matter upon which a prosecution might or could be founded against the witness? That there was no case pending against him is an admitted fact; that he had testified in regard to the same matter before the grand jury under promise of immunity is an admitted fact, but for some reason on the habeas corpus trial he declines to testify, giving as his reason that his answers might incriminate him. The district judge

and district attorney again pledged him immunity from prosecution, but he declines to testify.

Relator's able attorney argues and earnestly insists that although relator had testified before the grand jury under an agreement that he would not be prosecuted, that relator had the right to withdraw from such an agreement, and the State could not enforce it, but all the State could do would be to prosecute relator if it desired to do so. There is no doubt the State could proceed in that manner, if it desired to do so, but if the State elected not to do so, and again assured relator he would not be prosecuted for any offense growing out of this matter, why could he not be compelled to testify? In an unbroken line of decisions in this court, and the courts of other States, it is held that if a person has been tried and acquitted, he can then be compelled to testify against another, although his testimony might show a criminal connection with the offense; that if the statute of limitation furnishes a complete bar to him being prosecuted for the offense, he can be compelled to testify, on the ground that in either of these events, he would not be giving evidence against himself, for no criminal prosecution against him would lie. In an unbroken line of decisions this court has held, where the statutes of the State furnish complete immunity from prosecution for an offense, about which the witness is called to testify, he may be compelled to testify. The first case we find on this question, wherein our court passed on that question, is that of Floyd v. State, 7 Texas, 215, rendered in 1855. Judge Wheeler in rendering the opinion held that where a statute prescribes that a witness shall be exempt from liability for any offense of which he is compelled to give evidence, he can not claim the privilege of not answering, but he may be compelled to testify. This has been the unbroken rule of decision by our Supreme Court and this court from that day to this, and the law as thus announced is supported by the decisions of the United States Supreme Court and the great weight of authority both in this country and in England.

And while relator does not seriously contest this rule of law, yet he says the Legislature of this State by no statutory enactment has declared such to be the rule in cases of murder, and similar cases. Upon what ground is it the courts hold that the witness is compelled to testify? It is that either by an acquittal, by limitation, or by statutory enactment, no prosecution would lie against the witness about which he may be called to testify, and we might here say that we agree to the rule, that the exemption from prosecution must be so broad as to absolutely prohibit his prosecution and conviction for any offense about which he may be called to testify, otherwise he will be within the protection of the Constitution, and he can not be compelled to testify. But if the immunity given him by the law of the State is such as to absolutely protect him from all punishment for the offense about which he is called to testify, then under such circumstances he could not be said to be giving evidence against himself, and the constitutional inhibition has no appli-

cation any more than if he has been tried and acquitted, or the offense was barred by the statute of limitation, for in any and all of said events he is protected against *the evidence he may give being used against him,* and this is what the Constitution guarantees him—nothing more and nothing less.

The question then would be, do the laws of this State furnish relator full and ample immunity from punishment, if he should be compelled to testify? If so, he should be remanded to undergo the punishment assessed by the trial judge for contempt; if the law does not guarantee him absolute immunity from punishment in regard to the matters about which he would be compelled to testify, he is entitled to be discharged. The record, as hereinbefore recited, discloses that under an agreement of immunity from prosecution he did testify before the grand jury; that when called to testify on the habeas corpus trial of his mother and Peters he refused to testify, when he was again guaranteed immunity from prosecution by the district attorney, in open court, with the knowledge, sanction and approval of the district judge, and he was so informed. So the sole question is, did the district judge and district attorney have the authority and power under our law to guarantee and give this immunity from prosecution, and would our law and the courts enforce that immunity and protect relator from prosecution and punishment for any matter about which he might be called to testify in regard to the killing of his father? The right under our law of the district attorney, with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment, has never been seriously questioned in this State. In the case of Barrara v. State, 42 Texas, 260, and other cases when our Supreme Court had criminal jurisdiction, it was recognized that they had this authority and power under our laws. When this court was created in 1876, in the first volume of its reports, in the case of Bowden v. State, 1 Texas Crim. App., 137, it recognized and enforced the rule. In that case the district attorney, with the approval of the district judge, agreed with Bowden that he would dismiss the case against him if he would testify against Arnold, who was also indicted for the offense. The case was dismissed, but subsequently Bowden was reindicted, tried and convicted, although he had regularly attended court, and stood ready to testify at any and all times should Arnold be tried. In passing on that case, this court said: "There has been no default on his (Bowden's) part, and until there is, the plighted faith of the State should have been kept inviolate in his immunity from further prosecution and punishment," and the conviction was reversed on this sole ground. And this rule of law has been reaffirmed by this court in the cases of Holmes v. State, 20 Texas Crim. App., 509; Ex parte Greenhau, 53 S. W. Rep., 1024; Hardin v. State, 12 Texas Crim. App., 186; Cameron v. State, 32 Texas Crim. Rep., 180. In the Greenhau and Cameron cases, supra, this question is discussed at length, and it is held that the courts of this State, under our Code, have authority to give and guarantee absolute immunity to a

person who may be called to testify in regard to the transaction. If the rule of law was otherwise, and there was any question that the immunity given and tendered by the court was not an absolute immunity from punishment for the matters about which he is called to testify, then we think relator's contention would be sound. In the case of Young v. State, 45 Texas Crim. Rep., 202, it was held that a dismissal of a case in one court in consideration of the appellant's testifying was binding upon all the courts of the State, and the defendant could not be prosecuted for any matter growing out of the transaction in another, and upon appeal the case was reversed and dismissed. In that case the trial judge testified that there were two cases pending in Grimes County against the appellant, and upon the district attorney making a motion to dismiss to obtain the testimony of Young against Dunlap, he permitted the cases, one charging burglary and the one charging theft, against Young, to be dismissed but says he at the time remanded Young to the custody of the sheriff of Brazos County, where an indictment for theft growing out of the same transaction was pending, the stolen property having been carried into that county. This court held that the dismissal of the cases for burglary and theft in consideration of Young testifying carried with it complete immunity for any matter growing out of the transaction, and he could not thereafter be prosecuted for the theft in Brazos County, as hereinbefore stated reversing and dismissing the case against Young. Thus it is seen that our courts have construed the law to carry complete immunity from prosecution for any matter growing out of the transaction, and will not countenance nor permit the prosecution of a person under such circumstances. See also Stanford v. State, 42 Texas Crim. Rep., 343; Griffin v. State, 43 Texas Crim. Rep., 428; Taylor v. State, 50 Texas Crim. Rep., 380; Kain v. State, 16 Texas Crim. App., 282; Elliott v. State, 19 S. W. Rep., 249, and other cases.

Shortly after the writer's accession to this court the case of Hughes v. State, 62 Texas Crim. Rep., 288, was decided, and we therein held, in accordance with the authorities above cited as we understood them, that if complete immunity from prosecution for the transaction was tendered the witness, he could be compelled to testify. There was no dissent filed in that case, but in the later case of Ex parte Napoleon, 65 Texas Crim. Rep., 307, 144 S. W. Rep., 269, where we announced the same rule, Judge Davidson filed a vigorous dissent. At the time the opinion was handed down Judge Davidson stated that he would file a dissenting opinion, but the dissent was not prepared at the time, and the writer did not see it until it was published in the Southwestern Reporter. In this dissenting opinion Judge Davidson does not deny that the courts of this State, under our laws, have the authority to give and guarantee immunity from prosecution, but his dissent is based upon the proposition that he can *not be compelled to testify against others in matters in which he is criminally liable* without his consent, citing section 10 of the Bill of Rights, and cases cited, which we do not think

sustain his proposition, and later we will take up each of these cases and discuss them. He says:

"An inspection of the cases cited in the Park case shows that in each case there was an agreement with the witness to testify upon guaranteed immunity from prosecution. No case has been cited, and I believe none can be found in Texas, holding that a witness can be forced to testify against his confederates in a criminal prosecution, unless he has agreed so to do. He can not even then be forced to testify. If he agrees to do so upon promise of immunity and fails or refuses to carry out his agreement, he may be prosecuted in the case in which he made the agreement. Neely v. State, 27 Texas Crim. App., 324, 11 S. W. Rep., 376; Nicks v. State, 40 Texas Crim. Rep., 1, 48 S. W. Rep., 186; Ex parte Park, 37 Texas Crim. Rep., 590, 40 S. W. Rep., 300, 66 Am. St. Rep., 835; Stevens v. State, 42 Texas Crim. Rep., 154, 59 S. W. Rep., 545. The State may hold the indictment against him until he has complied with the agreement. Ex parte Greenhaw, 41 Texas Crim. Rep., 278, 53 S. W. Rep., 1024, and other cases cited, supra. In the Cameron case, 32 Texas Crim. Rep., 180, 22 S. W. Rep., 682, 40 Am. St. Rep., 763, an agreement made with the prosecution was required to be fulfilled. It was further held that, where the State has made such agreement, and the witness has complied with its terms, he is entitled to immunity. But in no case has it been held that the witness can be compelled to testify to any fact which would incriminate him. He may agree to do so, and if he fails or refuses he may be prosecuted as if he had not entered into such agreement.

"With the constitutional inhibition and guaranty that he shall not be compelled to give evidence against himself, it is not readily to be comprehended how it is to be held that the State can force the witness to testify against himself, even by agreeing not to prosecute. The witness may testify if he chooses; but it is a matter within his discretion to be controlled by him, and not by the prosecuting officers."

Thus it is seen he admits the witness can contract for immunity from prosecution, and then the immunity given is binding on the State and all its officers, and Judge Davidson, in an opinion by him, specifically so held in the case of Young v. State, 42 Texas Crim. Rep., 301, to which opinion we refer to show what authority the District Court has in the premises, and how complete immunity it can and does give even by agreeing to a dismissal of a case, when the case is dismissed in consideration of the witness testifying. So the question resolves itself down to the proposition, can the witness *be compelled to testify,* when immunity from prosecution is given him, if he does not desire to do so? There is and can be no question that if the witness has been tried and acquitted he can be *compelled* to testify; if limitation bars a prosecution against him he can be compelled to testify. All the decisions so hold, and what reason can be given, if he can be compelled to testify in those instances, that if immunity from prosecution is absolutely given him, under the laws of a State he can not then be compelled to testify. No

legal prosecution can be instituted against him in regard to the matters about which he may be called to testify in that instance, any more than in the other two instances, and as hereinbefore stated, in the case of Floyd v. State, 7 Texas, 215, our Supreme Court, in an opinion by Judge Wheeler, held that "if a prosecution is barred by the statute of limitations, he was *bound* to answer the question, for then he would not be liable to punishment. The same *principle* applies if the witness is exempted by statute from punishment in consequence of his being made a witness. And though the answer of a witness, called to testify respecting the offense to which the exemption relates, *would tend to inculpate him as a participant in the crime, he could not refuse to answer,* for his participation in the offense could not subject him to punishment." In that case the question before the court was, *could the witness be compelled to testify* when he did not desire to accept the immunity, and Judge Wheeler held he could. In fact, in that case the witness was fined for contempt for refusing to answer the questions as in this case, and the court held he was entitled to no relief, he being guaranteed immunity from prosecution, and should have answered the question. As hereinbefore stated, this opinion was handed down by our Supreme Court in 1855 when it had jurisdiction in criminal matters, and we know of no opinion even questioning the soundness of the law there announced, until the dissenting opinion in the Napoleon case, supra, was filed. Certainly the case of Ex parte Park, 37 Texas Crim. Rep., 540, cited by Judge Davidson as sustaining his dissent, does not question the soundness of the rule of law announced in Floyd case, supra, but on the other hand in the Park case, that case is cited approvingly, and the relator was discharged solely upon the ground that immunity was not given appellant from prosecution for such offenses as his testimony might and probably would necessarily be disclosed on his examination, and in the case it is held: "Article 709 further provides: 'The attorney representing the State may at any time, under the rules provided in article 37, dismiss a prosecution as to one or more defendants jointly indicted with others, and the person so discharged may be introduced as a witness by either party.' This would seem to imply the power on the part of the State to dismiss a case against defendant, and *require his testimony.* Of course, such dismissal must be with the guaranty to the witness on the part of the court against any other or further prosecution for the same offense; and this statute has been so construed. See Camron v. State, 32 Texas Crim. Rep., 180; Neeley v. State, 27 Texas Crim. App., 324; Fleming v. State, 28 Texas Crim. App., 234."

If the immunity offered would not absolutely protect the witness against prosecution for matters about which he was called to testify, then we would not question his right to refuse to answer the questions, but if complete and absolute immunity is offered, the Park case in the excerpt above quoted holds with the Floyd case, that he may be compelled to testify, and the Floyd case is cited as authority in the Park

case that the immunity must absolutely protect the witness from prosecution. In the Wilson case cited by Judge Davidson no immunity from prosecution was offered or tendered the witness, and the question of whether the witness can be compelled to testify when given absolute immunity is not even discussed nor questioned, but the relator was discharged because the testimony could be used. in a *criminal prosecution against him.* In the other cases cited by Judge Davidson in his dissent the question of whether a witness can be *compelled* to answer when given immunity from prosecution is not mentioned nor discussed, and have no bearing on that question. In the case of Griffin v. State, 43 Texas Crim. Rep., 428, article 391 of the Penal Code is quoted, this court saying: "This article provides 'Any court, officer or tribunal having jurisdiction of the offenses enumerated in this chapter or any district or county attorney may subpoena persons and compel their attendance as *witnesses to testify* as to violations of any of the provisions of the foregoing articles. Any person so summoned and examined shall not be liable to prosecution for any violation of said articles about which he may testify and for any offense enumerated in this chapter a conviction may be had upon the unsupported evidence of an accomplice or participant.' Kain v. State, 16 Texas Crim. App., 282; Day v. State, 27 Texas Crim. App., 143; Wright v. State, 23 Texas Crim. App., 313. And it would make no difference whether the grand jury had returned a bill or was simply examining into the transaction. If the testimony of one of the participants is used by any of these tribunals, courts, or officers in behalf of the State, it exonerates the witness whose testimony is used by virtue of the terms of the statute. Nor does it make any difference at what stage of the investigation or trial the evidence of the participant is used. The grand jury may not have been satisfied that the evidence upon which the bill was returned was sufficient to justify a conviction, but, if they had been, still, under the terms of the law, the use of the testimony of one of the participants exonerates him from prosecution. In cases where indictments have been returned, and one of the indicted parties was used as a witness for the State, this would exonerate, even though he be one of the *indicted* parties. Article 391, supra, was enacted for the purpose of *forcing witnesses to testify* in behalf of the State. He can not plead that rule of evidence which does not permit a witness to incriminate himself, because when he testifies he is exonerated from punishment, and the incriminating testimony can never be used against him. The mere fact that the participant is *required to testify* for the State exonerates him from punishment."

This opinion was written by Judge Davidson and concurred in by the entire court, and in it is seen this expression and used: "This article was enacted for the purpose of *forcing witnesses to testify,* and that when a witness is *exonerated from punishment* he can not plead the rule of evidence which does not permit a witness to incriminate himself." No more terse and forcible expression of the law could be made. See

also Elliott v. State, 19 S. W. Rep., 249; Taylor v. State, 50 Texas Crim. Rep., 183, and cases therein cited. So it may be said to be an unbroken rule of decisions both in this court and in the Supreme Court from 1855 down to the present time that a witness may be *compelled to testify* when under the law he is given complete immunity from punishment for the transaction about which he is called to testify, and the dissenting opinion in the Napoleon case is the first time that any judge of either this court or the Supreme Court has announced the rule that the *consent* of the witness must first be obtained. This would render ineffective our laws in regard to immunity from punishment, and place a barrier to the enforcement of the law in many instances. The sovereignty of this country rests in the individuals composing it, and we believe as firmly as any in protecting the individual in all his rights, and believe the declaration in our Constitution that "no citizen shall be compelled to give evidence against himself" a wise provision, and that the history of the times past when inquisitorial methods were adopted, and the citizen punished for matters thus disclosed by himself proves the wisdom of the fathers in first placing it in the Constitution of 1776, and in engrafting it in every State Constitution since that time. It is right, the individual should thus be protected, but when the law immunes him from punishment and he seeks to use this provision, not as a shield to himself but as a shield to others, the reason for this rule of law no longer prevails, and he will not be permitted to protect others from punishment. He is and must be protected before he can be compelled to testify, but when afforded ample and full protection from punishment, then the interest of the State, the interest of society, and the law requires that he shall give such testimony within his knowledge as will aid in bringing criminals to justice and mete out to them their merited punishment.

Not only is this the rule of law in this State, but owing to the importance of this question, we have studied the law as applied in other jurisdictions, and the great weight of authority is that the witness may be compelled to testify when he has been granted immunity, and is no longer subject to punishment in regard to the matters inquired about. Relator in his brief cites us to the case of Counselman v. Hitchcock, 142 U. S., 547, in which case Counselman was adjudged guilty of contempt for refusing to answer certain questions propounded to him by the grand jury, on the ground that to answer such questions might tend to criminate him. The court held that as the law then in force did not give Counselman complete immunity from punishment he was not compelled to answer the questions and discharged him. In that case it was held: "We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating questions put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statute does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional pro-

vision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates." To this statement of the true rule of law we give our hearty assent— the "law must afford absolute immunity against future prosecution for the offense to which the question relates," or the witness can not be compelled to testify. After the rendition of the above opinion, Congress amended section 860 referred to as to give complete immunity from punishment, and the question again came before the Supreme Court of the United States in the case of Brown v. Walker, 161 U. S., 591 (40 L. Ed., 819). In this case Brown had been summoned before the grand jury and refused to answer questions propounded to him on the ground that to do so would tend to incriminate him. The court holds, speaking through Justice Brown:

"1. The Act of Congress of February 11, 1893 (27 Stat. at L., 443), exempting a witness from any prosecution on account of any transaction to which he may testify, sufficiently satisfies the constitutional guaranty of protection against being compelled in any criminal case to be a witness against himself.

"2. Where one State adopts the laws of another, it is also presumed to adopt the known and settled construction of those laws by the courts of the State from which they are taken.

"3. The fact that a witness can not be shielded by statute from the personal disgrace or opprobrium attaching to the exposure of his crime does not render a statute exempting him from prosecution therefor insufficient to satisfy the constitutional guaranty of protection against being compelled to be a witness against himself."

The law furnishing Brown complete immunity, he was remanded to custody, and he was *compelled* to answer the questions propounded. The opinion in that case discusses the reasons for the rule at length, and it is referred to for a learned discussion of the question. This question was again before the Supreme Court of the United States in the case of Interstate Commerce Commission v. Baird et al., 194 U. S., 25, and it was again held that where the law furnishes complete immunity from prosecution a witness may be compelled to testify. For other cases so holding see Ex parte Cohen, 104 Cal., 524; People ex rel. Akin v. Butler, 201 Ill., 236; State v. Nowell, 58 N. H., 314; People v. Sharp, 107 N. Y., 427; State v. Morgan, 133 N. C., 743; Hendrick v. Com., 78 Va., 490; Ex parte Burkett, 106 Mo., 602; State v. Quarles, 13 Ark., 307; Higdon v. Heard, 14 Ga., 255; Wilkins v. Malonee, 14 Ind., 153; Hirsch v. State, 8 Bext (Tenn.), 89; Frizzee v. State, 58 Ind., 8; State v. Jack, 76 Pac. Rep., 911; People ex rel. Lewisohn, 179 N. Y., 594; Re Briggs, 135 N. C., 118. Many other cases could be cited and we quote as stated in Cyc., vol. 30, page 1161:

"In a number of the States having constitutional provisions similar to that contained in the Fifth Amendment to the Constitution of the United States, it has been held that statutes which provide that a witness may be compelled to give self-criminating evidence, but that his answers

shall not thereafter be used as evidence against him, fully preserve the constitutional privilege.

"It is the better opinion, however, that the constitutional privilege of refusing to answer can not be taken away by statute, unless absolute indemnity is provided, and that nothing short of complete immunity to the witness, an absolute wiping out of the offense as to him, so that he can no longer be prosecuted for it, will furnish that indemnity, and that statutes aiming to take away the constitutional privilege without providing complete immunity are unconstitutional.

"If, however, he is thus fully protected by statute, he may be compelled to answer, though his testimony may show that he has committed a crime."

Under these texts is cited cases from almost every State in the Union, and we adhere to the rule that, "nothing short of complete immunity to the witness" will justify a court in compelling a witness to testify, and if the Codes of our State, as construed in an unbroken line of decisions, had not held that when the district attorney tenders immunity from punishment, and such offer receives the sanction and approval of the district judge, that this furnished absolute and complete immunity from punishment for offenses about which he might be questioned and called to testify, we would hold that relator was within the protection of section 10 of the Bill of Rights and he could not be compelled to testify. But as the proof in this case shows that relator was extended and accepted immunity and testified before the grand jury; that that body returned no bill against him, and he has never been charged by complaint or otherwise with this offense; that when the habeas corpus trial was called, and he refused to testify, he was again tendered complete immunity from punishment by the district attorney and the district judge which gave him absolute immunity from punishment, and he was only committed to jail for contempt after a refusal to testify under such circumstances, it is our opinion that he should be remanded to custody, and it is so ordered.

The fact that on the trial the relator may not testify truthfully and thereby become subject to a prosecution for perjury, need not be considered. The immunity given relator was immunity from punishment for any connection he may have had with the killing of his father, and if he thereafter commits perjury, be connected with the killing of another, if another, or thereafter commits any other offense, the immunity given for this crime would be no bar to a prosecution for an offense of any character thereafter committed.

The relator is remanded.

*Relator remanded to custody.*

DAVIDSON, Judge, dissents.

ON REHEARING.

January 21, 1914.

 HARPER, JUDGE.—Relator's counsel has filed a motion for a rehearing and an able argument thereon. We will first take up the grounds of the motion and then discuss the argument filed. The first ground assigned is: "The following statement in said opinion is erroneous and in the face of the record, to-wit: 'The district attorney in open court stated he would agree that the relator should not be prosecuted for any offense growing out of the killing of J. M. Muncy; and L. S. Kinder, judge of the Sixty-fourth Judicial District, acquiesced in and approved said offer.'" The contention of relator is that the immunity offered was only immunity for "the offense of murdering J. M. Muncy." This was the question being inquired into and investigated, but it is contended that the testimony of relator might show that he was an accomplice or an accessory to such crime, and that the immunity given would not bar a conviction for those offenses or either of them. Such is not the law in this State. In the case of Heinzman v. State, 34 Texas Crim. Rep., 76, this court holds: "The rule is, that such an agreement can only be made with a witness in regard to a particular transaction under investigation. *His protection extends* to any connected offense which in good faith he discloses, as a part of the one to which he was admitted as a witness, though in truth the transaction constitutes a separate crime, but not two distinct offenses," citing 1st Bish. Crim. Proc., secs. 1164, 1165; Rex v. Lee, Russ. & R., 361; Rex v. Brunton, id., 454; The People v. Whipple, 9 Cow., 707. This has always been the rule in this court, and was specifically enforced in the case of Young v. State, 45 Texas Crim. Rep., 202, referred to in the original opinion. Other cases might be cited but we deem it unnecessary. And when the district attorney agreed "that there would be no prosecution of the witness for the offense of murdering J. M. Muncy," this embraced any connected offense which he might disclose, though in truth a separate and distinct offense should be disclosed growing out of the transaction under investigation.

 The relator next questions the statement in the original opinion that he was promised immunity when called before the grand jury, and says he can not understand how we made that mistake, and devotes considerable space to a presentation of that matter. We might plead that if we were misled, we were misled by relator's counsel in their brief and argument for therein they say: "But it is contended by the State that the relator having testified before the grand jury, and having agreed with the district attorney that he would testify to the same facts on the trial of the case, he is bound by his agreement, and must testify," and then relator's counsel argues that if he had made such agreement he had a right to withdraw from the agreement, and cites cases wherein a withdrawal had been recognized, among them the case of Neeley v. State, 27 Texas Crim. App., 324, 11 S. W. Rep., 376. In the testimony of District Attorney Mayfield will be found the following expression: "I don't think

I asked him if he would testify to these things if I wouldn't prosecute him. As to my agreeing not to prosecute him in that connection, that was discussed. I don't know that I told him that I wouldn't, but that was the meaning of my talk to him, but I do not know the words used." The witness had first refused to testify before the grand jury, and after this conversation with the district attorney he did testify before the grand jury, and in the original brief appellant's counsel seemed to have come to the same conclusion we did, but now another of the counsel for relator says such a conclusion is unauthorized. But that is wholly immaterial, as it is conclusively shown and admitted by relator's counsel that immunity was tendered both by the district attorney and the district judge before relator was fined for refusing to testify.

In the third ground the same statement is assailed, and the further statement that there is no case pending against relator. In the briefs by Mr. Penry for relator, and Mr. Works for the State, and in their oral argument before this court, it was conceded that no case had ever been filed against relator, and County Attorney Bartley so testified in the agreed statement of facts now on file in this court. He states he started to file a complaint, but says: "I had come in possession of new facts and never wrote any complaint against the boy at all; *and no warrant* was ever issued for his arrest. There is no complaint against this boy now, nor has there been since that time."

The remainder of the motion complains of the ruling and conclusions of law in the case, and appellant cites a number of cases from the Federal Reporter as sustaining his contention. These opinions are by Federal District Courts, and were rendered prior to the last decisions by the U. S. Supreme Court, cited in the original opinion, and, of course, would no longer be authority, for the court having final appellate jurisdiction over them has ruled and held otherwise. Brown v. Walker, 161 U. S. 591, and cases there cited, and cited in the original opinion. Appellant cites us also to the case of Holmes v. State, 20 Texas Crim. App., 509, as sustaining his contention, and argues that the law is correctly enunciated in that case. Appellant ought to remember that the opinion in the Holmes case was contrary to all the opinions rendered by this court and the Supreme Court prior to that time, and shortly after it was rendered it was overruled in the case of Camron v. State, 32 Texas Crim. Rep., 180, and the rule announced in the Camron case has been consistently followed in this State since its rendition. And in that case it was specifically held that under our Code of Criminal Procedure, the district judge and district attorney were authorized to grant and give complete immunity from punishment. For a further discussion of the question, and the authorities relied on so holding, we refer to that case, and the cases cited in the original opinion.

Relator, in his brief, cites two cases laying down the following rule: "In the case of Cullen v. Commonwealth, 24 Grat., 624, quoted with approval by Justice Sherwood in the well considered case of Ex parte Carter, 66 S. W., 540, the following language is used: 'That nothing

short of complete amnesty to the witness and absolute wiping out of the offense as to him, so that he could no longer be prosecuted for it, would furnish indemnity.'

"The case of State v. Jack, 76 Pac. Rep., 911, the court in reply to the contention that complete immunity had not been provided, used the following language: 'As to prosecutions for those crimes to which his evidence relates, under the Immunity Act, the witness is in the same position, in so far as there is a possibility of using his evidence against him, as though there were no such crimes provided by the statute.' "

To this rule of law we tried to make it plain in the original opinion we acceded and concurred in, but if we did not do so, we now say and hold that the immunity given must be complete and absolute immunity as to the transaction under investigation; and so as to that feature of the question we need not discuss, and as in their brief and argument relator concedes that under our law the district judge and district attorney can give absolute immunity under a *contract* with the witness, and this will absolutely protect him from future prosecution; and concedes that as the law now is, if the prosecution is barred by the statute of limitation; is barred by the witness having been tried and acquitted; is granted immunity specifically by our statute, as under our gaming laws, then the witness can be *compelled to testify,* and neither of these is violative of his constitutional right, so it is unnecessary to discuss those features either. While in his argument relator goes into the matter at length and discusses many authorities, when boiled down to its last analysis, his contention amounts to this: That if the statute gives specific exemption as in gaming cases, the witness can be compelled, but if instead of doing that, the statute gives power and authority to the district judge and district attorney, when they deem that the interests of public justice demands it, to grant immunity, then in that event, although the immunity they can and do give, is absolute, yet, they must get down on their knees and beseech the person whom it is desired to use as a witness to enter into a contract and agreement with the State. What an ignoble spectacle the great State of Texas would be reduced to. We grant and state that if the power to give this immunity was not vested in the district judge and district attorney by our Criminal Code, and the decisions of this court, then the witness could not be forced to testify. On the other hand, when it is conceded, as is done in all the opinions cited by appellant, and cited by us in the original opinion, that our Criminal Code does give and grant authority and power to the district attorney and district judge to give absolute immunity from punishment, and that it is binding upon all courts, there is no rule, nor would there be sound sense in any rule which would hold that in case the prosecution is barred by limitation, is barred by an acquittal, is granted specifically as in gaming cases, the witness could be compelled to testify and not be compelled to do so in the other instances. Why is he compelled to testify in the first instance mentioned? Because no prosecu-

tion can be maintained against him. Then why should he not be compelled in the latter instance, for no prosecution can be maintained against him.

It is ingenuously argued that it does not bar an indictment,—it simply bars a conviction. Neither does the statute in regard to gaming bar an indictment,—it simply bars a conviction. And so in this instance the immunity granted by the court perpetually bars a conviction in this State, and it is an absolute bar to a conviction, as is formal acquittal, limitation, etc. Again, it is said that he must testify truthfully. In a gaming case, if a man is called as a witness, the statute gives him immunity. But if he testifies that he was in no game, and never saw the person on trial gamble, if it should develop that he did witness the game, and did gamble with the person on trial, he could be prosecuted for perjury, and so he might in this instance, but this does not prevent the immunity being as complete in one instance as in the other.

Relator has filed what he terms as amended argument on motion for rehearing, in which he contends that the rules of law announced in this opinion are contrary to our decision in the case of Snodgrass v. State, 150 S. W. Rep., 162, in which we held that *after conviction* the Constitution of this State conferred upon the Governor the sole power of granting pardons. To the rules of law announced in the Snodgrass case we adhere, and we thank counsel for his statement, "that it is one of the most exhaustive and luminous decisions ever rendered in Texas," but wherein he misconceives that opinion is in contending that power of pardon is inherent in the executive department of the government. The pardoning power is inherent in sovereignty, and sovereignty abiding in the people of this State, they could confide it to or confer it upon any of the departments of the government if they saw proper. In the Constitution this power is given to the Governor *after conviction* only, and the power to pardon *before* conviction still rests with the sovereign people, and they acting through their representatives, the Legislature, could bestow it upon the Governor, the courts, or any other agency of government or by legislative act, could reprieve or pardon before conviction, and on this theory the second suspended sentence law was sustained by this court. (See Baker v. State, 70 Texas Crim. Rep., 618, 158 S. W. Rep., 998.) In that case it was held the Legislature had the authority and power *before conviction* to, in effect, authorize the giving or granting of pardon. Under our Constitution the power to pardon granted to the Governor is to pardon *after conviction.* The line of authority in the Legislature to give to others the authority to pardon, grant reprieves, amnesty, etc., must there be drawn, and there is no limitation on the Legislature before conviction, otherwise all laws which provide that a person may be called to testify, but shall not thereafter be prosecuted, would be void, and this relator concedes is not true, for he concedes that Floyd v. State, 7 Texas, 215, correctly lays down the law. He says, "The Floyd case lays down the obviously correct rule that where an acquittal is had or the offense barred by the stat-

ute of limitation (both statutory modes for the obliteration of offenses) that the witness can not claim his constitutional privilege of silence. To this class also belong the Griffin, Taylor, Kain and Elliott cases, cited by Judge Harper, they being all gaming cases, where the immunity statutes protect the witness. The cases cited from other States, and from the Supreme Court of the United States, in the latter part of the majority opinion, are without exception cases arising under immunity statutes, mostly anti-trust cases where the courts hold, as do the Texas courts, that the witness is amply protected. We concede the correctness of all these decisions. The Legislature may provide the immunity of a witness because it has the sole right to define crime, and the very fact that every State in the Union from which the majority cites cases has seen fit to pass general immunity statutes, pertaining to certain offenses, argue very strongly that none of these statutes recognize the courts as having inherent power to grant immunity, else why such statutes."

We did not hold in the original opinion, nor do we now hold that the courts have *inherent power* to grant immunity. In fact we agree with relator that they have not this inherent power, but whatever authority they have or exercise in this matter must arise and be given them by laws enacted by the Legislature, and all the decisions quoted in the original opinion show that this authority and power as exercised by the courts of this State is under specific statutory provisions. A reading of those cases will demonstrate this beyond question.

There is but one other question which we will refer to, and that is, it is contended that this gives to the courts the power to suspend a law of the State. Relator cites no law that will be suspended under such circumstances, and we know of none. In fact the courts derive their power to grant immunity before trial and conviction from the laws of the State as shown in the Cameron and other cases cited in the original opinion. The Legislature, the law-making power, has placed these provisions in our Code of Criminal Procedure, and conferred this authority on the judiciary, and as the representatives of the sovereignty of the soil, they had the power to do so. No law is suspended, but the courts in their action are but giving life and vitality to the laws as passed by the Legislature. Articles 37, 630 and 790, White's Ann. Code of Procedure, and cases in sections 787 and 556, subdivision 2.

Judge Davidson at the time the original opinion was written, gave notice that he would file a dissent, but he has not done so as yet. If he should later file a dissenting opinion, we may at that time add further to this opinion overruling the motion for a rehearing.

*Overruled.*

DAVIDSON, Judge (dissenting.)—In dissenting I do not care to make a statement of the facts. While I am not agreeing fully as to the scope of the statement in the opinion by Judge Harper, yet so far as the dissenting views that I express are concerned, I have not considered it very material as to whether the proffered immunity from punishment

or prosecution on the part of the district attorney and the district judge relates only to this particular homicide, or whether it includes all connected crimes, or alleged connected crimes. The proposition on which I base this dissent is, that it makes no difference how broad the proffer of immunity might be, that it is without the power of the district attorney or district judge, either or both, to grant absolute immunity from punishment. It seems that the leading case cited by Judge Harper, and upon which he perhaps mainly bases his opinion, is Brown v. Walker, 161 U. S., 591; at least it is cited as authority to uphold the majority opinion as found in his original opinion and in the opinion on rehearing. An inspection of that case shows it was rendered by a divided court, four of the members dissenting. Those who dissented were present Chief Justice White of that august tribunal, and Justices Field, Gray and Shiras. That case then became the law merely by a majority of one member of the court. The explanations, differentiations and modifications of that case which have since taken place, have greatly weakened the majority opinion, and lessen its scope of operation from the great extent to which it was at first supposed to operate. However, as that case is the leading one upholding the right to force a witness to testify where there is complete statutory immunity, and as it was regarded by the dissenting judges to be in direct conflict with the case of Counselman v. Hitchcock, 142 U. S., 547, it requires some special consideration as to its meaning and extent. The prevailing opinion in that case contains, inter alia, the following observations:

"The maxim *nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and—until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power—was not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high—in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to brow-beat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier State trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a

denial of the right to question an accused person a part of their funda-
mental law, so that a maxim which in England was a mere rule of evi-
dence, became clothed in this country with the impregnability of a
constitutional enactment." (161 U. S., 596.)

. . . "The Act of Congress in question securing to witnesses im-
munity from prosecution, is virtually an Act of general amnesty, and
belongs to a class of legislation which is not uncommon either in Eng-
land (2 Taylor on Evidence, Section 1455, where a large number of
similar acts are collated) or in this country. Although the Constitu-
tion vested in the President 'power to grant reprieves and pardons for
offenses against the United States, except in cases of impeachment,'
this power has never been held to take from Congress the power to pass
acts of general amnesty, and is ordinarily exercised in cases of individ-
uals after conviction, although as was said by that court in Ex parte
Garland, 4 Wall., 333: 'It extends to every offense known to the law
and may be exercised at any time after its commission, either before
legal proceedings are taken, or during their pendency or after con-
viction and judgment.'" (161 U. S., 601.)

Quoting with approval a California case and a Tennessee case, the
prevailing opinion continues: "In such a case he is not compelled to
give evidence which may be used against himself in any criminal case,
for the reason that the Legislature has declared that there can be no
criminal case against him which the evidence which he gives may tend
to establish. In Hirsch v. State, 67 Tenn., 89, the same construction was
given to a similar statute in Tennessee, which exempted witnesses from
prosecution for offenses as to which they had given testimony before
the grand jury, the court holding that this was 'an abrogation of the
offense'; that the witness could neither be accused by another, nor could
he accuse himself, and, therefore, he could not criminate himself by
such testimony. It is but just to say, however, that in Warner v.
State, 81 Tenn., 52, the same statute was construed as merely offering
a *reward to a witness for waiving* his constitutional privilege, and not as
*compelling* him to answer." (161 U. S., at page 604.)

"It is entirely true that the statute does not purport, nor is it possible
for any statute, to shield the witness from the personal disgrace or op-
probrium attaching to the exposure of his crime; but, as we have observed,
the authorities are numerous, and very nearly uniform, to the effect that
if the proposed testimony is material to the issue on trial, the fact that
the testimony may tend to degrade the witness in public estimation, does
not exempt him from the duty of disclosure." (Id., p. 605.)

The court then proceeds to hold that the Act of Congress, since it
provided complete immunity from the witness being "prosecuted or
subjected to any penalty or forfeiture, for or on account of any trans-
action, matter or thing concerning which he may testify, or produce
evidence documentary or otherwise," that the Fifth Amendment to the
Federal Constitution had no application to the case, as he was not

thus made a witness against himself to the extent of causing self-incrimination.

In the dissenting opinion in that case Justices Shiras, Gray and White (present Chief Justice of the United States), quoting from the leading case of Counselman v. Hitchcock, 142 U. S., 547, 562, said: "It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as' broad as the mischief against which it seeks to guard. 142 U. S., 547." (161 U. S., at p. 618.) The dissent continuing, shows that the prevailing opinion in the case is in direct conflict with Counselman v. Hitchcock, supra. The dissent, speaking of the immunity statute of Congress, continues: "It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property in a criminal proceeding in such court. It could not prevent the obtaining and use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted when otherwise, and if he had refused to answer, he could not possibly have been convicted." (161 U. S., p. 619.) Quoting again: "As already said, the very fact that the founders of our institutions, by making the immunity an express provision of the Constitution, disclosed an intention to protect it from legislative attack, creates a presumption against *any* Act professing to dispense with the constitutional privilege." (Id., p. 621.)

"It is certainly speaking within bounds to say that the effect of the provision in question, as a protection to the witness, is purely conjectural. No court can foresee all the results and consequences that may follow from enforcing this law in any given case. It is quite certain that the witness is compelled to testify against himself. Can any court be certain that a sure and sufficient substitute for the constitutional immunity has been supplied by this Act; and if there be room for reasonable doubt, is not the conclusion an obvious and necessary one?

"It is worthy of observation that opposite views of the validity of this provision have been expressed in the only two cases in which the question has arisen in the Circuit Court—one, in the case of the United States v. James, 60 Fed. Rep., 257, where the Act was held void; the other, the present case. In most of the cases cited, wherein State courts have passed upon analogous questions, and have upheld the sufficiency of a statute dispensing with the constitutional immunity, there have been dissenting judges.

"A final observation, which ought not to be necessary, but which seem to be called for by the tenor of some of the arguments that have

been pressed on the court, is that the constitutional privilege was intended as a shield for the innocent as well as for the guilty. A moment's thought will show that a perfectly innocent person may expose himself to accusation, and even condemnation, by being compelled to disclose facts and circumstances known only to himself, but which, when once disclosed, he may be entirely unable to explain as consistent with innocence.

"But surely no apology for the Constitution, as it exists, is called for. The task of the courts is performed if the Constitution is sustained in its entirety, in its letter and spirit." (Id., 627, 628.)

Justice Field, also dissenting in the case, among other things, observed: "The citizen can not be denied the protection of absolute silence which he may invoke, not only with reference to the offense charged, but with respect to any Act of criminality which may be suggested. (161 U. S., 631.)

"The constitutional guarantee is not fully secured by simply exempting the witness from prosecution for the designated offense involved in his answer as a witness. It extends to exemption from not only prosecution for the offense under consideration but from prosecution for any offense to which the testimony produced may lead.

"The witness is entitled to the shield of absolute silence respecting either. It thus exempts him from prosecution beyond the protection conferred by the Act of Congress. It exempts him where the statute might subject him to self-incrimination.

"The amendment also protects him from all compulsory testimony which would expose him to infamy and disgrace, though the facts disclosed might not lead to a criminal prosecution. It is contended, indeed, that it was not the object of the constitutional safeguard to protect the witness against infamy and disgrace. It is urged that its sole purpose was to protect him against incriminating testimony with reference to the offense under prosecution. But I do not agree that such limited protection was all that was secured. As stated by counsel of the appellant, 'it is entirely possible, and certainly not impossible, that the framers of the Constitution reasoned that in bestowing upon witnesses in criminal cases the privilege of silence when in danger of self-incrimination, they would at the same time save him in all such cases from the shame and infamy of confessing disgraceful crimes and thus preserve to him some measure of self-respect. . . .' It is true, as counsel observes, that 'both the safeguard of the Constitution and the common law rule spring alike from that sentiment of personal self-respect, liberty, independence and dignity which has inhabited the breasts of English speaking peoples for centuries, and to save which they have always been ready to sacrifice many governmental facilities and conveniences. In scarcely anything has that sentiment been more manifest than in the abhorrence felt at the legal compulsion upon witnesses to make concessions which must cover the witness with lasting shame and leave him degraded both in his own eyes and those of others. What can

be more abhorrent . . . than to compel a man who has fought his
way from obscurity to dignity and honor to reveal crimes of which he
had repented and of which the world was ignorant?' "

"This court has declared, as stated, that 'no attempted substitute for
the constitutional safeguard is sufficient unless it is a complete sub-
stitute.' Such is not the nature and effect of this statute of Congress
under consideration. A witness, as observed by counsel, called upon
to testify to something which will incriminate him, claims the benefit
of the safeguard; he is told that the statute fully protects him against
prosecution for his crime; 'but,' he says, 'it leaves me covered with in-
famy and unable to associate with my fellows'; he is then told that under
the rule of the common law he would not have been protected against
mere infamy, and that the constitutional provision does not assume to
protect against infamy alone, and that it should not be supposed that
its object was to protect against infamy even when associated with
crime. But he answers: 'I am not claiming any common law priv-
ilege, but this particular constitutional safeguard. What its purpose
was, does not matter. It saves me from infamy, and you furnish me
with no equivalent, unless by such equivalent I am equally saved from
infamy.' And it is very justly urged that 'a statute is not full equiv-
alent under which a witness may be compelled to cover himself with the
infamy of a crime, even though he may be armed with a protection
against its merely penal consequences.' " (Id., 631 to 633.)

"Every one is protected by the common law from compulsory incrim-
ination of himself. This protection is a part of that general security
which the common law affords against defamation, that is, against
malicious and false imputations upon one's character, as it defends
against injurious assaults upon one's person, even though the defama-
tion is created by publication made by himself under compulsion. The
defamation arising from self-incrimination may be equally injurious
as if originating from the maliciousness of others. The reprobation
of compulsory self-incrimination is an established doctrine of our civ-
ilized society. As stated by appellant's counsel, it is the 'result of the
long struggle between the opposing forces of the spirit of individual
liberty on the one hand and the collective power of the State on the
other.' As such, it should be condemned with great earnestness.

"The essential and inherent cruelty of compelling a man to expose his
own guilt is obvious to every one, and needs no illustration. It is
plain to every person who gives the subject a moment's thought.

"A sense of personal degradation in being compelled to incriminate
one's self must create a feeling of abhorrence in the community at its
attempted enforcement.

"The counsel of the appellant justly observes on this subject, as on
many of the proceedings taken to escape from the enforcement of the
constitutional and legal protection, established to guard a citizen from
any unnecessary restraints upon his person, action or speech, that 'the
proud sense of personal independence which is the basis of the most

valued qualities of a free citizen is sustained and cultivated by the consciousness that there are limits which even the State can not pass in tearing open the secrets of his bosom. The limit which the law carefully assigns to the power to make searches and seizures proceeds from the same source.'

"The doctrine condemning attempts at self-incrimination is declared in numerous cases. Starkie, in his treatise on Evidence, observes that the rule forbidding such incrimination is based upon two grounds, one of policy and one of humanity, 'of policy because it would force a witness under a strong temptation to commit perjury, and of humanity because it would be to extort a confession by duress, every species and description of which the law abhors.' (Am. ed., pp. 40, 41.)

"But there is another and conclusive reason against the statute of Congress. It undertakes, in effect, to grant a pardon in certain cases to offenders against the law, that is, on condition that they will give full answers to certain interrogatories propounded. It declares that the alleged offender shall not be punished for his offense upon his compliance with a certain condition. The legal exemption of an individual from the punishment which the law prescribes for the crime he has committed is a pardon, by whatever name the Act may be termed. And a pardon is an Act of grace which is, so far as relates to offenders against the United States, the sole prerogative of the President to grant."

"In Ex parte Garland, 4 Wall., 333, this court, after stating that the Constitution provides that the President shall have power to grant reprieves and pardons for offenders against the United States, except in cases of impeachment, says: . . . 'This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him can not be affected by any legislative restrictions.'

"Congress can not grant a pardon. That is an act of grace which can only be performed by the President. The constitutional privilege invoked by the appellant should have had full effect, and its influence should not have been weakened in any respect by the statute which attempted to exercise a prerogative solely possessed by the President." (161 U. S., 636 to 638.)

After collating the authorities and discussing the principles involved therein, the United States Supreme Court in U. S. v. Ford, 99 U. S., 994, expressly decided that the power to grant immunity was lodged in the pardoning power only, and such is the rule recognized by the overwhelming weight of authority. These quotations are given to show that it has never been recognized that the judicial department of the government had the inherent right to grant immunity, for such a right belonged only to the executive department of the government by the exercise of its pardoning power, or to the legislative department by providing that upon the happening of certain contingencies no offense existed, as in our gaming statute.

Brown v. Walker was a case which treated of a statute which declared complete immunity to a witness from prosecution on account of any matter brought out in an examination before a grand jury investigation of violations of the Interstate Commerce Act. It is undoubtedly true that many decisions can be found requiring a disclosure of matters that would incriminate the witness, were it not for *statutory acts completely immuning* him not merely from punishment but *also from any act of prosecution,* and *any step toward prosecution.* An indictment found under such circumstances would be a nullity as soon as the defendant should show to the court that the crime charged was one concerning which he had given testimony in a judicial proceeding in which such statutory immunity existed. In such case and upon such showing, the defendant would not even be put to trial before a jury if the question was raised by proper procedure before a trial, and the court fully shown the fact of such testimony and immunity. But statutory immunity and judicio-administrative immunity are two vastly different matters. Statutory immunity virtually repeals the law creating the crime under the particular state of facts, or, to put it in technical form, the law defining the offense is restricted in its application so as to prevent there being an offense under a given state of facts in which the immunity is declared to exist. That this is true is apparent from even the prevailing opinion in the instant case as shown by the expressions of Judge Harper. It is there and elsewhere said that the "offense is wiped out," and that the witness "stands with respect thereto, as if it had never been committed." See Brown v. Walker, 161 U. S., 591. That the courts can not exercise a pardoning power is shown by the recent decision of this court, one opinion having been rendered by Judge Harper and the other by the writer. See Snodgrass v. State, 150 S. W. Rep., 162 and 178. That the administrative office of county or district attorney has never had a pardoning power conferred upon it will hardly be gainsaid by any one. That the Legislature has never conferred upon either the court or the State's attorney, or both, the power to suspend the laws or grant an amnesty or a pardon in a murder case, is admitted on all sides. Nor could such power be conferred by the Legislature so long as article 1, section 28, of our State Constitution exists. Indeed, in the case at bar, there has been an attempt to *thrust* upon applicant, *against his will,* and over his solemn protest an immunity which is not provided for by any statute. It is safe to say that no case can be found anywhere in America or England since 1688 in which a court and the State's attorney can, in the absence of statute, thrust upon a witness immunity and compel him to waive his constitutional right to remain silent when his answers would incriminate him. The statute of this State *supposed* to *allow* a *bargain* or *agreement* between State's attorney and the defendant as to turning State's evidence against colleagues in crime *necessarily requires* the *assent* of the *accused,* and no case to the contrary can be found, unless it is the obiter

dictum in the recent case of Napoleon v. State, 65 Texas Crim. Rep., 307, 144 S. W. Rep., 269.

The statute allowing the dismissal of a case against one defendant and providing that he can then be called as a witness was passed merely for the purpose of making him a qualified witness, for, under our law, where there are several persons accused of the same crime, they were not and are not competent witnesses for each other; and this statute was passed merely for the purpose of making one or more of the accused persons competent witnesses. When so rendered competent, the witness is like any other witness, subject to the same right and duties. His right to refuse to incriminate himself is the same as that of any other witness, and there is no statute which by its language takes away such right. And *no statute which fails to create complete immunity could lawfully be passed, and this is exactly what was held in the prevailing opinion in Brown v. Walker, supra.* That *complete immunity is not guaranteed when a case is dismissed and the dismissed defendant is called to testify under the dismissal statute above referred to* (C. C. P., Art. 729) appears from the decisions of Moseley v. State, 35 Texas Crim. Rep., 210; Nicks v. State, 40 Texas Crim. Rep., 1, and cases there cited, where it is held that the immunity involved in such dismissal (under Rev. C. C. P., of 1911, arts. 729, 37 and 572, paragraph 2) pertains to the particular case only which is dismissed, and not to any other distinct offense. This immunity is not equivalent to that required by the case of Brown v. Walker, where the act of Congress stated that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any *transaction, matter or thing concerning which he may testify or produce evidence,* documentary or otherwise, before said commission."

To revert to the difference between judicio-administrative and statutory amnesty, it must be observed that to allow the former without statutory enactment would be to allow the *court and State's attorney to suspend the law, in direct violation of art. 1, sec. 28, Texas Constitution,* which says: "No power of suspending laws in this State shall be exercised except by the Legislature." (See Harris' Ann. Const., p. 208.) This section was adopted since 1869, to-wit: January 24, 1874. Gammel's Laws of Texas, vol. 8, bottom pages 235-237, and was made to supersede the old section existing from 1845, which was in the same words as the present, except that the words "or its authority" followed the word "Legislature." This former addendum "or its authority" was cut out of the Constitution by amendment of 1874, thereby *excluding the idea that the Legislature could delegate this authority either to the courts or any other officer or tribunal.* Not only does it exclude such idea, but it is a *positive inhibition.* The *very object and intent of that amendment was to prevent a delegation of the power,* which delegation had worked woeful results, especially in the "Reconstruction" days. The following quotation from Harris' Texas Constitution annotated, p. 211, makes this very clear:

"(15) Act of Thirtieth Legislature, known as 'wife and child

abandonment law,' and which gives the trial judge the power of suspending the operation of the law, contravenes this section and is unconstitutional. Ex parte Smythe, 56 Texas Crim. Rep., 375, 120 S. W. Rep., 200; Burch v. State, 56 Texas Crim. Rep., 200, 120 S. W. Rep., 206; Phillips v. State, 56 Texas Crim. Rep., 220, 120 S. W. Rep., 207; Adams v. State, 56 Texas Crim. Rep., 199, 120 S. W. Rep., 208; McFarlin v. State, 123 S. W. Rep., 133.

"(17)   City charter can not authorize city to set apart a portion of the city where lewd women may ply their vocation, in contravention of the statute law of the State. McDonald v. Denton, 132 S. W. Rep., 823, 135 S. W. Rep., 1148. See also Brown Cracker Co. v. Dallas, 104 Texas 290, 137 S. W. Rep., 342; Burton v. Dupree, 46 S. W. Rep., 272. (See Harris' Annotated Const., p. 209, for collated cases.)

"(18)   The Legislature alone has the power of suspending the operation of general laws, and, in exercising the power, must make the suspension general, and can not suspend general laws for individual cases or for particular localities, nor delegate authority to a city to suspend certain laws of the State as to certain individuals in certain localities. McDonald v. Denton, 132 S. W. Rep., 823, 135 S. W. Rep., 1148." Arroyo v. State, 69 S. W. Rep., 503.

This question received consideration in the case of Ex parte Smythe, 56 Texas Crim. Rep., 375, 120 S. W. Rep., 200, in which case this court held the wife abandonment law unconstitutional because it authorized the court to suspend punishment in violation of said section 28 of the Bill of Rights.

Again, such a power vested in our courts to thrust immunity upon a witness and hold him under indictment pending the giving of his testimony would deprive a citizen of his constitutional right to a speedy public trial. This exact question has also been recently before the court, and in the case of Waldon v. State, 50 Texas Crim. Rep., 512, 98 S. W. Rep., 848, it was held that the acts of the Twenty-eighth Legislature suspending prosecution in a seduction case for two years upon certain conditions was unconstitutional, because it deprived the defendant of a speedy public trial. The immunity, if any, was conditional, not absolute nor complete from prosecution.

If the principles of the Greenhaw case are inapplicable to this case, then the majority opinion as shown above is absolutely without any authority whatever to sustain its view, and if this case is applicable and justifies the opinion of the majority, it removes the very foundation stones upon which the civil liberty of the citizens of Texas now rests. The *majority concede that unless relator is protected from prosecution he must be discharged, yet they cite a decision as sustaining them which expressly holds that the granting of immunity by the court does not protect the relator from indictment nor imprisonment.* To my mind the distinction between this case and some cases cited in the majority opinion upon this phase of the question is obvious. In this case there can be a valid indictment and legal imprisonment. In the cases under the

immunity statute there could be neither, as a defendant could resort to the method of habeas corpus for his release if he were protected by the immunity statute which had obliterated the offense as to him before he had testified, but in this case he is absolutely without any remedy to obtain a speedy public trial or to obtain his discharge in case of arrest, or even bail if it were a capital offense. This exact question has been before the courts of other States, and it has been uniformly held so far as a most painstaking investigation by me has shown that *the power to thrust immunity upon a witness against his consent and compel his testimony where such testimony implicates him in a crime, had never been lodged or vested in the judicial department of the government.*

The question of the right of the court to grant immunity came up for consideration by a Virginia court, in the case of Temple v. Commonwealth, 75 Va., 892, and the *right* in that case *was absolutely denied.* The court in disposing of the matter uses in part the following language: "No implied suggestions by the court, nor any implied or positive promise by the Commonwealth's attorney, could operate as an indemnity to the witness that he would not be further prosecuted. He had a right to stand upon his constitutional privileges and not to trust to the chances of a further prosecution. The court of course, *could offer him no indemnity.* . . . He has a right to stand upon his constitutional privilege and to remain silent whenever any question is asked him, the answer to which may tend to incriminate himself."

Upon this subject of the power of suspension of the law there was bitter contest, judicial and otherwise, in England for many years, until after the revolution of 1688, which put an end to the idea that there could be a suspension except by the power of Parliament, which in that country has all of the residuum of power. When the Federal Constitution of the United States was formed, the history of this subject was before our people, and in that instrument the power to suspend the laws was given to no officer or tribunal, except in one instance, and that is that the writ of habeas corpus can be suspended "when in case of rebellion or invasion the public safety may require it." The department or tribunal that is to suspend the writ (or law) was not fixed by the Constitution but left an open question. In the historical case of Ex parte Bollman and Swartwout (4 Cranch, 75, 100), involving the commitment of the petitioners on a charge of treason for having plotted to levy war against the United States in the Aaron Burr conspiracy, Chief Justice Marshall, on the subject of suspension of the writ of habeas corpus, said: "If at any time the public safety should require the suspension of the powers vested by this [Federal habeas corpus] act in the courts of the United States, it is for the *Legislature* to say so. That question depends on political considerations on which the *Legislature* is to decide. Until the *legislative* will be expressed, this court can only see its duty and *must obey the law.*" (4 Cranch, loc. cit., 100.) From the time of this observation by Marshall, Chief Justice, in 1807, down through the Dorr Rebellion case (Luther & Borden, 7 Howard, U. S.

Sup. Ct., 1), decided by Taney, Chief Justice, and on down to the case of Merryman (Taney's Rep., p. 246), also decided by Taney, Chief Justice, and on through the host of various cases arising from the War Between the States (which are collated in a valuable note in 45 L. R. A., p. 832, and additional cases found in the note to the 12th Law Edition of the Reports of the U. S. Sup. Ct., 581), and including the renowned and celebrated decision and opinion of Mr. Justice Davis in Milligan's case in 1866 (4 Wallace, U. S. Sup. Ct., pp. 1-124, 125, 126, 128, 131), and also as held by Joseph Storey in his great work on the Federal Constitution, it has been held, until this case at bar, that where there is power to suspend the law, and that power is not expressly conferred on any particular officer or department, that the *legislative power alone,* or the legislative power in conjunction with the executive, is the only situs of such power. But our Constitution (art. 1, sec. 28), puts this matter beyond cavil, question or dispute. In Milligan's case the learned justice in commenting on suspension of laws and habeas corpus said: "The proposition is this: 'that in time of war the commander of an armed force . . . has power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to his will; and in the exercise of his lawful authority can not be restrained except by his superior officer, or the President of the United States. . . . If our fathers had failed to provide for just such contingency, they would have been false to the trust imposed on them. . . . They knew . . . that unlimited power, wherever lodged, at such a time, was especially hazardous to freemen. For this and other equally weighty reasons they secured the inheritance they fought to maintain by incorporating in a written Constitution the safeguards which time has proved were essential to its preservation. *Not one* of these safeguards can the President, or Congress, or the judiciary, disturb, *except the one* concerning the writ of habeas corpus. It is essential to the safety of every government that, in a great crisis, like the one we have just passed through, there should be a power somewhere of suspending the writ of habeas corpus. . . . They [our forefathers in forming the Constitution] limited the suspension of *one* great right, and left *the rest* to remain inviolable." (4 Wall., p. 124, 125, 126.)

Again, concerning power to suspend laws, he says: "The Virginia Assembly [in colonial times] also denounced a similar measure on the part of Governor Dunmore 'as an assumed power, which the King himself can not exercise, because it annuls the law of the land, and introduces the most execrable of all systems, martial law.'"

It matters not whether the suspension of law is only in one instance, or in one class of cases, or extends to the numerous evils of martial law, in order for such an act to be violative of our Constitution; for, in the course of time, with gradual, unobserved and piecemeal encroachments, the one will beget the other.

That the Virginia Assembly as quoted above in its view that the King

could not suspend the laws, and that Parliament alone could suspend them, was uncontrovertably correct, see 1 Blackstone Com., pp. 136, 233, 234, 235, 236, 238, 239, 250, 251, 252, 262. That Congress alone, with the co-operation of the President, has power to suspend only the privilege of the writ of habeas corpus, and not other rights or laws, see Johnson v. Duncan, 3 Martin (La.), 530, and the note in same case in 6 Am. Dec., p. 690, 675. In this last case reference is made to the Bollman and Swartwout case, and Chief Justice Marshall is quoted as hereinabove set forth, to the effect, that the *legislative department alone* can suspend the laws where they are authorized to be suspended, and which authorization applies only to privilege of habeas corpus, and not to other laws, or rights. The Constitution of Louisiana at that time was in the exact words of our own Constitution as it existed prior to the amendment of 1874, ours having been copied from Louisiana.

I quote from the able brief of the applicant's counsel, as expressive of my legal and philosophical sentiments, as follows:

"In the case of Johnson v. Duncan, 6 Am. Dec., p. 675, the court says: 'The power of repealing a law and that of suspending it, which is a partial repeal, are legislative powers.' If so, it is difficult to conceive how the judicial department can arrogate to itself the right to hold a murder case over relator for an indefinite time against his consent.

"That such a rule will be the sword that strikes civil liberty in Texas to its very heart and will bring us again to the inquisitorial methods of England and Spain, against which condition both the Federal and State Constitutions are framed to protect the citizens, can not be disputed. Again, conceding such power of the court, the immunity offered must be for all offenses incident to, connected with or arising out, of the transaction about which the witness is called to testify. Granting that a general promise of immunity might be this broad, it could not be contended that an immunity that was expressly limited to one offense, as was done in this case, could protect a witness. Our Penal Code provides in substance that when an agreement is entered into between two or more persons to commit a felony, that such an agreement itself, without proof that it was ever consummated, constitutes a felony and is punishable by imprisonment in the penitentiary."

The Bollman and Swartwout case, as shown by Shepard's U. S. Sup. Ct. Citations, and 3 Dig. U. S. Sup. Ct. Rep. (Lawyer Co-op. ed.), p. 3240, paragraph 93, has been cited and upheld on one topic or another, twenty-two times by the Federal Supreme Court, from the time it was rendered to the 215 United States Report, scattered all along in our history, and has never been weakened as an authority, and was the basis of the Louisiana case above mentioned on the topic at hand. It also has been cited with approval in 15 Federal cases in courts inferior to the Supreme Court.

Having shown above that there is no power to suspend the laws in this State except when done by the Legislature; and that the Legislature, under our present Constitution, considering the history thereof,

and change therein as above set forth, can not delegate this power; and having shown that even the Legislature is limited in the exercise of such power, let us revert to the decision in Brown v. Walker, and the proposition that courts can not suspend the criminal law of the State either with or without the request or aid of the State's attorney. In every case where the attempt has been made to serve a judicio-administrative amnesty for the giving of testimony, it has signally failed when there was no statute especially authorizing it. The cases of statutory amnesty to a witness as found in the anti-trust, interstate commerce, and bankruptcy laws, have no application, and no statute of a general nature has ever been passed applying them to the general criminal laws of this State; or to homicide, which is the crime involved in the case at bar. The cases cited hereafter deny that the courts have any such power, without statute expressly authorizing it.

In the case of Nachman (114 Fed. Rep., 995), a bankrupt was being examined as to business transactions which would incriminate him. He claimed his privilege under United States Constitutional amendment 5, providing that no person shall be compelled to incriminate himself. Against this claim was cited the bankruptcy act, 1898, sec. 7, which provides that no testimony given by a bankrupt on examination concerning conduct of his business shall be offered in evidence against him in any criminal proceeding, and the case of Brown v. Walker was cited. Following this last cited case the court said: "No act of Congress can deprive a citizen of the privilege afforded by the Constitution unless it supplies a *complete* protection from *all* perils against which the Constitution was intended to provide. Section 7 of the Bankruptcy Act cited above, does not provide such complete immunity," citing Counselman v. Hitchcock, 142 U. S., 547, which involved the Interstate Commerce Act, which on immunity was broader than any Texas statute as to dismissals or any question of that character. The court then refers to the charge in the interstate commerce law, and to Brown v. Walker, and continues: "It may well be contended that the object designed to be accomplished by sec. 7 of the Bankruptcy Act, which requires the bankrupt to submit to an examination concerning the conduct of his business, will be defeated, if the witness is thus permitted to refuse to testify concerning his dealings with his creditors and others, and such undoubtedly is the unfortunate results; but it is for the *Congress* to provide, if it can, against such contingencies. . . . The *courts can not* deprive a citizen of the constitutional right invoked by him for his protection upon any consideration of inconvenience or for the purpose of administering what it may regard as a salutary or useful law." (114 Fed., 997.) The court held that the bankrupt could not be compelled to testify.

In Foot v. Buchanan, 113 Fed. Rep., 156, there was an attempt to compel a witness to testify before a grand jury investigating transactions which were criminal violations of the Federal anti-trust laws, in which transactions he had participated. He claimed his exemption from giv-

ing such testimony on the ground of the Fifth Amendment of the United States Constitution against compulsory incrimination. The court said: "It is set up in the answer filed by the district attorney, that the petitioner, when carried before the court upon his failure to answer questions before the grand jury, was *assured by the court* that no information given by him in his answers to the questions would or could be used against him. . . . The petitioner could *not* be required *to waive* his constitutional privilege upon *such an assurance by the court*. He has a right to stand upon his constitutional privilege *notwithstanding such assurance,* and to remain silent whenever any question is asked, the answer to which may tend to incriminate him," citing Temple v. Commonwealth, 75 Va., 892. The case of Brown v. Walker was cited and considered in this Federal case (113 Fed. Rep., 161). To the same effect is the case of United States v. Bell, 81 Fed. Rep., 830. Among other things that case holds: "If one, fully cognizant of his constitutional right to remain silent in respect to matters tending to incriminate himself, *abandons it,* whether under *compulsion or otherwise,* and essays to speak under oath, he must speak the truth, and may be prosecuted for perjury if he does not; but, before this principle can be invoked, it must appear that the witness' abandonment of his rights was *knowingly* and *understandingly* made, and that no undue advantage has been taken of an ignorant witness in the course of an inquisitorial examination."

In this, the Bell case, the court said: "No stated *rule* or *regulation* or *act of administration* in the given case can be constitutional which does not in some way protect the right *to be silent* if the citizen *chooses to be silent.* Whether any given citizen has exercised his right *to waive* his privilege, and speak voluntarily, subject to the pains and penalties of the statute against perjury, depends upon the circumstances of each particular case, and upon this alone. In this case the defendant did not waive his privilege under the Fifth Amendment, under the facts above stated"—which facts were unlawful exaction and undue compulsion of the false testimony. The court held that there can be no *waiver* of the rights of exemption from self-incrimination under such circumstances, that perjury could not be predicated on the false testimony, and the defendant was discharged. This case shows the great extent to which the law of exemption from self-incrimination has been carried, and how strongly the law denounces the idea that immunity can be *thrust* upon a witness, or that without his consent he can be *compelled* to *waive* his constitutional rights, for *consent is an essential to waiver.* And in this case Brown v. Walker was fully considered, and quoted from. The opinion in this (Bell case) is an elaborate one, reviewing a host of authorities, and drawing many analogies and parallels, and is in full accord with all the able decisions on the topic. It shows that *statutes granting complete immunity in one class of cases can not be applied to any other class, whether the immunity is greater or less or otherwise.* But it holds there must be a *statute* authorizing the grant of complete

immunity, and that *judicial inference* can not *take the place of such a statute.* As is well said in that case (81 Fed. on p. 850): "Until *Congress* shall set about improving the system of inquisition [in pension fraud cases], it is not to be expected that the *courts* shall aid its usefulness at the expense of the constitutional protection of every citizen."

Further showing that there can be no judicio-administrative immunity, and that it must be entirely statutory, the following is taken from the opinion in Hale v. Henkel, 201 U. S., on pp. 43 and 68: "If the [fifth] constitutional amendment were unaffected by the immunity statute it would put it within the power of the witness to be his own judge as to what would tend to incriminate him, and would justify him in refusing to answer almost any question in a criminal case, unless it clearly appeared that the immunity was not set up in good faith." And so said Chief Justice Marshall in the Aaron Burr treason case, 1 Burr's Trial, 244, 245, 190, 193.

Upon this subject the case of Ex parte Irvine (74 Fed. Rep., 954), decided by Judge Wm. H. Taft, afterwards President of the United States, is an authority. Judge Taft said:

"It is argued for the respondent represented by the attorneys for the U. S. he is given by virtue of the action of the government entire and absolute immunity from prosecution for the offense to which the alleged incriminating question relates, by the long approved practice of recommending to the pardon of the executive, accomplices and co-defendants whom the government calls to establish its case against the principals and other defendants. The cases of Rex v. Rudd, 1 Cowp., 331; People v. Whipple, 7 Cowp., 707, and Commonwealth v. Knapp, 10 Pick., 492, are relied upon to show the extent and binding effect of such a rule. These cases show there is an equitable right to a pardon where an accomplice is called by the government to give testimony against those with whom he was engaged in violating the law; but we do not find any authority, and none is cited to us, in which an equitable right to executive pardon, if the witness states fully and fairly the truth, has ever been held to do away with the constitutional privilege not to give evidence against himself *if he chooses to claim it.* See whisky cases, 99 U. S., 594. *It is a mere equity, after all, not dependent upon a positive statute, and commensurate only with full and fair revelation by the witness of the entire truth.*" Ex parte Irvine, 74 Fed. Rep., 954.

The case of State v. Warner, 81 Tenn., p. 52, involved the construction of the grand jury statute, which provided in the usual way for investigations of crime. Section 5089 (Code of Tennessee of 1858), provided as follows: "And no witness shall be indicted for any offense in relation to which he has testified before the grand jury." In construing this statute the court, on pages 62, 63, 64 of the 81st Tennessee, said:

"The purpose of the Act is to offer inducements to persons who have committed offenses against law in connection with others to divulge the secret. There is *nothing compulsory* in the language nor could there be without a violation of the Constitution. It recognizes by its terms a

want of authority in the Legislature to command the witness to testify; and merely offers a reward to him if he has or will do so. The *witness may elect* to take advantage of the law, or take chances of a discovery and conviction of himself. By it the Legislature proposes to buy the evidence of one guilty man against another or others, and to pay for it by exemption from indictment for the offense in relation to which he has testified. In this case the court has undertaken *to compel* the witness to give evidence against himself. *The Constitution says this shall not be done.* The court claims the authority under section 5089. Both the Legislature and the courts are creatures of the Constitution, and must conform their actions to its provisions. The Legislature could not say the witness *shall* testify, but could and did say, *if he will*, etc., and the *courts* can do *no more*. This witness must *determine for himself* whether he will accept the legislative reward offered for his testimony. Whether the constitutional protection thrown around offenders is good or bad policy, is a question with which courts and Legislatures have no concern. They must support and enforce the Constitution as they find it. Being its creatures they must obey its mandates, and not evade them by strained construction for any emergency, however important to public weal it may seem.

"The language of both the Constitution and the statute is plain, simple and unambiguous. The one is positive in *prohibiting compulsion*, the other simple in its offer *of inducement* and reward to an offender to betray his fellows by *voluntary* election to testify for the sake of protection to himself.

"At common law the rule is, that if an associate in crime will reveal upon his fellows and testify against parties to the same crime, he may reasonably hope the State will in consideration pardon his offense. It was a part of the rule, that the government was not bound to apply it. The object of the *hope* held out by that rule was to increase the means of discovery and punishing offenses.

"Our law-makers recognizing the utility of the rule, but seeing that it did not accomplish to any great extent the ends aimed at, modified it by converting a *bare hope* into an *absolute assurance*, making it a positive mandate instead of a discretion resting in the breasts of courts and attorneys-general. *So that our statute is nothing more than the common-law rule, made certain of application.*

"Under the common-law rule the offered witness could not be *compelled* to testify; then why should a different practice obtain under the same rule declared by statute in more direct and trustworthy terms under a Constitution protecting a witness from giving evidence against himself, while the common-law rule is untrammeled by Constitution except as it comes of usage and precedent?

"In State against Hatfield, Judge McKinney, with the statute before him for construction, says 'such person [meaning a person before the grand jury by compulsion] can not be compelled to criminate himself, but as an inducement to a full and unrestrained disclosure in re-

gard to others without peril to himself it was deemed politic, *in the event of doing so,* to exempt him from prosecution.'

"There can be no doubt as to the meaning of this language. It is susceptible of but one construction, which is, that *compulsion* was *not* intended, and that *inducement* was the *sole* object of the legislation."

Brown v. Walker is referred to in Bram v. U. S., 168 U. S., 532. The latter decision shows all the English law, and that at the time of adoption of American Constitutions it was a fundamental right at common law not to compel self-incrimination.

The following are the Texas statutes that are involved in this question:

Article 729, C. C. P. "The attorney representing the State may, at any time, under the rules provided in article 37, dismiss a prosecution as to one or more defendants jointly indicted with others; and the person so discharged may be introduced as a witness by either party."

Article 730, C. C. P. "When it is apparent that there is *no evidence against a defendant* in any case where he is jointly prosecuted with others, the jury may be directed to find a verdict as to such defendant, and, if they acquit, he may be introduced as a witness in the case."

Article 37, C. C. P. "The district or county attorney shall not dismiss a case unless he shall file a written statement with the papers in the case, setting out his reasons for such dismissal, which reasons shall be incorporated in the judgment of dismissal; and no case shall be dismissed without the permission of the presiding judge, who shall be satisfied that the reasons so stated are good and sufficient to authorize such dismissal."

Article 572, C. C. P. "The only special pleas which can be heard for the defendant are:

"1. That he has been convicted legally, in a court of competent jurisdiction, upon the same accusation, after having been tried upon the merits for the same offense.

"2. That he has been before acquitted by a jury of the accusation against him, in a court of competent jurisdiction, whether the acquittal was regular or irregular."

None of these statutes says *anything at all about immunity.* The only immunity that exists in this State is by the judicial application of the law that where one agrees to turn State's evidence, and keeps his agreement, that he can not afterwards be prosecuted for the evidence he gives. That this was judicial amnesty there can be no doubt, but the rule had its origin under, and can be justified only by the former Constitution when the provision existed that the laws can not be suspended except "by the Legislature *or its authority,*" which to a certain extent might probably be considered as allowing a shadowy implication that the Legislature might delegate that power to a limited extent. *But since that clause has been eradicated, there is no power of delegation whatever.* But even under the holdings that where one agrees to turn State's evidence under promise of immunity he will be immuned, there is no holding whatever in any case, showing that immunity can be

*thrust* upon him without his consent. Every case of that character is based upon an agreement; and there can be no agreement when one of the parties to it is *forced* against his will; and as said by the various courts above quoted, especially in the case of Nachman (114 Fed. Rep., 995, 997), Foot v. Buchanan (113 Fed. Rep., 156, 161), U. S. v. Bell (81 Fed., 830, 850), Warner v. State (81 Tenn., 52, loc. cit., 61, 62), a witness can not be *made or compelled to waive* his privilege, although he may waive it if done freely, without compulsion, and voluntarily, and no advantage is taken of him by reason of his ignorance or otherwise, and this is exactly what was held in the Bell case, supra (81 Fed. Rep., 830, loc. cit., 850). Even under the old Constitution the decisions went as far as was possible to go constitutionally in granting immunity, and certainly under the present Constitution the rule ought not to be extended farther. But in none of the cases was *compulsion* used against a witness to *make* him testify to matters that would incriminate him but for the immunity granted. If he did not choose to testify, he did not earn his immunity, and might be prosecuted. This put our State exactly in line with the Tennessee case referred to.

In the majority opinion a quotation is made from Cyc. with approval, as follows: "The constitutional privilege of refusing to answer can not be taken away by statute, unless absolute indemnity is provided, and that nothing short of complete immunity to the witness, an absolute wiping out of the offense as to him, so that he can no longer be prosecuted for it, will furnish that indemnity, and that statutes aiming to take away the constitutional privilege without providing complete immunity are unconstitutional." This is in line with quoted cases. Some of the decisions cited in the majority opinion lay down the positive rule that the offense about which witnesses are called to testify must be obliterated and wiped out of existence before the court can compel their testimony. In the case of Cullen v. Commonwealth, quoted with approval by Justice Sherwood in his great opinion in Ex parte Carter, 66 S. W. Rep., 540, he uses the following language: "That nothing short of complete amnesty to the witness and absolute wiping out of the offense as to him, so that he could no longer be prosecuted for it, would furnish that indemnity."

In the case of State v. Jack, 76 Pac. Rep., 911, it was said, in reply to the contention that complete immunity had not been provided: "As to prosecutions for those crimes to which his evidence relates, under the Immunity Act, the witness is in the same position, in so far as there is a possibility of using his evidence against him, as though there were no such crimes provided by the statute." Judge Brooks in his dissenting opinion in the case of Ex parte Max Andrews, 51 Texas Crim. Rep., 79, while not agreeing with the majority opinion on some of the matters, referred approvingly to Judge Sherwood's opinion in Ex parte Carter. I quote from Judge Brooks' opinion: "If relator was exempt from prosecution by this statute, when compelled to give evidence against himself, he should have been required to testify. *Of course, the exemp-*

*tion must be absolute.* Ex parte Carter, 66 S. W. Rep., 540." These authorities might be pursued indefinitely and almost without limit, holding that when the *witness shall be immune, that the immunity must be absolute and complete so far that he could not be prosecuted for a violation of the statute* or under the statute for the offense in which he gives his testimony against others. It may not be without the pale of judicial reasoning to say that wherever the witness is required to testify to incriminating facts by the *statute,* and that *statute* gives complete immunity so that he can not be prosecuted, he may be forced to testify. He may be then compelled to give evidence, *but in no other case and under no other circumstances can his testimony be compelled.* Under our statute which has been previously quoted in this dissenting opinion, wherein a witness may agree to testify and does testify truthfully in accordance with his contract, which contract, of course, must be ratified by the judge, he may claim his exemption from prosecution; but that is in *every instance by agreement of the witness* with the constituted authority authorized to make the agreement subject to approval of the court. This question came up for revision in the case of Cameron v. State, 32 Texas Crim. Rep., and it was there so held, but under all of the authorities *this is not complete or absolute immunity. The immunity is dependent upon conditions and circumstances which prevent it from being a complete immunity as under statutory immunity or statutory amnesty. This is but an agreement, which may be broken by the witness. He may decline to* testify in the case, and *if he does, he is not immune but may be prosecuted.* This is so by all the authorities. He may testify untruthfully and be subject still to prosecution not only for the case in which he delivers the false testimony and in which he turns State's evidence, but also for the perjury committed on the trial of the case. This is not a novel rule in Texas, and in fact it is so in the cases cited in the majority opinion. It is deemed unnecessary to review or cite those cases. It is so in the elementary works. It is so wherever constitutional jurisprudence is known among our race —England and America. So that wherever the party *agrees* to testify, *there is not complete immunity and can not be immunity until after the witness has* testified. See Greenhaw v. State, 41 Texas Crim. Rep., 278; Gibson v. State, 42 Texas Crim. Rep., 653; Ex parte Carter, 62 Texas Crim. Rep., 113. The last mentioned case—Ex parte Carter— was delivered on 19th day of April, 1911, by this court. The writer of this dissent wrote the opinion in that case, citing Ex parte Greenhaw v. State, supra. The court was then constituted as it is now constituted. In the Greenhaw and Carter cases, supra, Greenhaw and Carter had by agreement with the State turned State's evidence and were used as witnesses in the respective cases by the State. Greenhaw resorted to a writ of habeas corpus for the purpose of obtaining bail, because of his contract with the State, approved by the court, to testify against his codefendant, and further, that he was carrying out his contract in good faith. The trial court decided against him, and on appeal this court

affirmed the judgment on the theory that he *was not immune from punishment and was not entitled to bail* as a witness in the case, but *would be held* under the indictment of murder *until the final disposition of the other cases.* The substance and effect of that decision was to hold that while he had faithfully carried out the contract on his part, he still *was not immune from punishment until after the final disposition of the case* in which he turned State's evidence. There can be no other conclusion except that he was not immune from punishment until final disposition of the case in which he turned State's evidence. *Therefore, he did not have complete immunity and could not have complete immunity,* because the whole matter *was conditional.* This *differentiates it from the statutory immunity,* which is complete whenever he was used as a witness and compelled to testify. The same proposition exactly occurred in the Carter case. Carter had turned State's evidence against Grant. The case had been tried and conviction had been obtained. On appeal that conviction was set aside. His co-defendant was again convicted. Appellant sought release as a witness because he had faithfully carried out his part of the contract in testifying. This court held he *was not immune,* and that he *could not be discharged as a witness,* but *would be held as defendant* in the case *until final disposition* of the Grant case in which he turned State's evidence. *If these decisions settle anything they do settle the proposition that there was no complete immunity. It was conditional, pure and simple. Nothing is complete and effective and full until all the conditions have been complied with and result declared under such agreement* to turn State's evidence. Therefore, I assert again, there was no immunity in the case until the final disposition of the case in which he turned State's evidence. A *conditional immunity* is not complete immunity any more than a *conditional pardon is an absolute pardon.* This rule is recognized in all the decisions in Texas so far as I am aware. The proposition is laid down by Mr. Branch in his work on Criminal Law, section 678 in this wise: "If the State makes a contract with defendant for immunity from prosecution in consideration of his turning State's evidence, it is due the dignity of the State that the contract be carried out in good faith, and where such defense is set up, and it appears that a valid contract was made, and carried out by defendant in good faith, the court should dismiss the case. Camron v. State, 32 Texas Crim. Rep., 180, 22 S. W. Rep., 682; Hardin v. State, 12 Texas Crim. App., 186; Bowden v. State, 1 Texas Crim. App., 137." It is further stated by Mr. Branch in the same work and same section: "*An agreement to turn State's evidence will not bar a prosecution, where the agreement is violated by false testimony or by a refusal to testify in good faith, fairly and fully,* as to facts within the knowledge of the proposed witness. Meeley v. State, 27 Texas Crim. App., 324, 11 S. W. Rep., 376; Nicks v. State, 40 Texas Crim. Rep., 1, 48 S. W. Rep., 186; Tullis v. State, 41 Texas Crim. Rep., 87, 52 S. W. Rep., 83; Heinzman v. State, 34 Texas Crim. Rep., 76, 29 S. W. Rep., 482; Cox v. State, 69 S. W. Rep.,

145." Again he says: *"A party is not entitled to immunity from prosecution until he complies with his contract."*

There is another reason why the court can not, at request of State's attorney or otherwise, compel the accused to testify against his will, and that is, that the immunity granted to obtain testimony is in the nature of a pardon or amnesty, and no pardon or amnesty can be effective until voluntarily accepted by the person pardoned. This, in my investigation, is the universal rule, so far as it has been formally adjudicated in all the American courts. The case of Brown v. Walker, as quoted above, holds that legislative amnesty, in cases like this, *is a pardon—* or *"general amnesty."* The court also said, "it is almost a necessary corollary of the above propositions that, if the witness has already received a pardon, he can not longer set up his privilege, since he stands with respect to such offense as if it had never been committed" (citing many English cases), 161 U. S. at p. 599.

That a pardon *must be accepted* by the person in whose favor it is granted, and *has no effect when not so accepted,* is the holding in the following cases and authorities: Chief Justice Marshall, in U. S. v. Wilson, 7 Pet. (U. S. Sup. Ct.), 150, 29 Cyc., p. 1565, section 2; Rosson v. State, 23 Texas Crim. App., 287, 4 S. W. Rep., 897; Hunnicutt v. State, 18 Texas Crim. App., 498, 51 Am. Rep., 330; Ex parte Powell, 73 Ala., 517, 49 Am. Rep., 71; Michael v. State, 40 Ala., 361; Redd v. State, 65 Ark., 475, 47 S. W. Rep., 119; People v. Potter, 1 Parker Cr. N. Y., 47; Commonwealth v. Holloway, 44 Pa. St., 210, 84 Am. Dec., 431; In re Conditional Discharge of Convicts, 73 Vt., 414, 423; 51 Atl., 10, 56 L. R. A., 658, 660, 37 Cent. Digest, Title Pardon, section 15; In re De Puy, 7 Fed. Case No. 3814, 3 Ben., 307; Ex parte Reno, 66 Mo., p. 266, 27 Am. Rep., 337; Saunders v. U. S., 73 Fed. Rep., 784; Grubb v. Bullock, 44 Ga., at p. 381; Commonwealth v. Shisler, 2 Phila., 258, 14 Phia. Leg. Int., 93; Ex parte Lockhart, 1 Disney (Ohio), 108; In re Calicott, 4 Blatcbf. (U. S.), 89.

The rule last above stated applies to a conditional pardon as well as to an absolute one. Lee v. Murphy, 22 Gratt. (Va.), 789; 12 Am. Rep., 563, 24 Vol. Am. & Eng. Law, 2nd ed., pp. 577-8.

In United States v. Wilson (7 Peters at p. 160), Chief Justice Marshall said: "A pardon is a deed, to the validity of which delivery is essential. *It may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to force it on him.* It may be supposed that no being condemned to death would reject a pardon; but the rule must be the same in capital cases and in misdemeanors." This is the common law (see Hawkins b. 2, Ch. 37, section 59, where it is said: "But it is certain that a man may waive the benefit of a pardon under the great seal," etc.), and is the statutory and constitutional construction also of all American law. Marshall, Chief Justice, in the Wilson case cites case after case of waiver of pardon and shows that it can not be forced upon the beneficiary.

So far, in a general way, two phases of this matter have been discussed, and incidentally the third. The first is, immunity under a statute which requires the defendant to testify as in the anti-trust and corporation cases, and matters of that sort, in which he may be compelled to testify and be immune. Under this phase he would be immune whether he testified truthfully or falsely. He might be convicted of perjury, but not tried in the immune case in which he was compelled to testify in which he would incriminate himself. The second is by agreement and contract he makes with the State. The first is complete immunity; the second *grants no immunity at all until after the contract has been fully and fairly and truthfully performed.* The third is the one at issue in this case. The majority opinion cited the cases under the two preceding questions as authority for the third. How this can be, I do not understand. In neither of the other cases is he *compelled* to give evidence against himself. In the first question put he is rendered immune by the Act of the Legislature, which suspends or repeals the Act so far as he is concerned, and, therefore, he can not be subject to punishment. He is granted complete and absolute immunity, and all prosecution against him is eliminated and barred by legislative authority. Enough has been said of that. In the second, he can only claim it, as before stated, *under contract,* which is *conditional to be performed,* and, therefore, there is *no immunity,* and *can not be any immunity until after the matter has been fully adjudicated in court and he has complied with his contract.* Then in good faith he may insist upon being discharged and not prosecuted. It is a question of having his case dismissed because of the fact that he turned State's evidence, and the prosecution is not to be further carried on. The question here, however, is flatly, squarely and incisively put, that the district attorney, with the sanction of the district judge, *can compel, without an agreement or without statute,* a witness to testify and incriminate himself. If there is anything that is squarely in the face of the constitutional inhibition, it is this holding. The Constitution provides that an accused shall not be compelled to give evidence against himself. My brethren put it on the ground that he is immune by order of the district court under *agreement* with the district attorney. But the witness has not *agreed.*

The Legislature has not sought to pass such legislation. That body of course could not suspend the Bill of Rights. It has not conferred, nor sought to confer any authority upon the District Court to render immune any defendant in any case in Texas and force him to testify. This is *compulsion in the face of the organic law and prohibition of the Bill of Rights.* These matters have been referred to somewhat in previous portions of this dissent as being collated in Mr. Harris' excellent annotated Constitution. The Legislature, had it sought to do so, could not confer power upon the district judge to suspend any law in Texas. The Constitution, Bill of Rights, section 28, expressly *inhibits* the *suspension of any law except by the Legislature itself.* The Legislature, therefore, could not confer authority upon the district judge to suspend the laws

of this State, and in fact does not confer that authority upon any department of Texas government or any officer within its bounds. We have had recently a very thorough test of this matter in the cases of Snodgrass v. State, supra. Judge Harper wrote one of the original opinions and the writer of this dissent wrote the other in the Snodgrass cases. On rehearing Judge Harper wrote elaborately and strongly against the very proposition that is involved in this case, holding that in those cases the Legislature could not confer such power upon the district judge, either to suspend the law, or pardon the party convicted, and the Act of the Legislature was held unconstitutional. I cite Snodgrass cases as authority *in point against the prevailing* opinion in this case, and as supporting this dissent. If they do not do so, then I am at a loss to understand the propositions and principles announced in these cases. Authority to suspend sentence is legislative and not judicial. The court can not force upon or refuse such suspension. It can only be raised by the accused in sworn plea, and can then be determined only by the verdict of the jury. By that verdict the court is unalterably bound. Baker v. State, 158 S. W. Rep., 998. The Baker case is directly in point and positive authority against the majority opinion in the instant case as are the Snodgrass cases. I might elaborate this proposition by citing numerous cases in Texas and throughout the Federal Union, State and Federal, to the effect that no power can suspend a law in the State unless expressly authorized by the Constitution, and even under the Federal Constitution itself the Congress can not do it except in the instance of writ of habeas corpus under circumstances mentioned in the Federal Constitution. In Texas, however, the Bill of Rights expressly provides that the writ of habeas corpus in this State shall never be suspended. The Bill of Rights places that beyond the power of the Legislature. The Governor, Legislature and courts combined, if adhering to the provisions of the Constitution, can not set aside the writ of habeas corpus or suspend it. It might be entertaining and instructive to follow up these questions. Questions arose during the late civil war in Texas and the proposition was asserted that civil liberty dominated and was superior to military authority, even in the troublesome times of that great war. I say without fear of any contradiction that there can not be found a well considered case where it has been held that the court can suspend a law in Texas and compel a witness to testify against himself, and that the Legislature of Texas has never sought to confer any such authority upon any tribunal in Texas since the amendment of the Bill of Rights in 1874. Back of that, is the suspension of the laws in Texas in the Reconstruction times, when the troublesome days immediately followed, that serve today as a blot upon our civilization and jurisprudence. This instant case, perhaps, has gone further than any case of which I have any knowledge in the history of our jurisprudence. If the court can compel witnesses to incriminate themselves, and testify against themselves, at its will and pleasure, then the question may well be asked, what guarantee have the

people of this State of their constitutional rights or the safety of themselves under the inhibitions contained in the Bill of Rights which they sought to accord themselves in their freedom?

I have written perhaps more than is necessary, and more than ought to be necessary, but this is such a wide departure from our law, and, as I view it, such an overturning of the fundamental law itself, that I have felt I should write what I have written, and call attention to the fact that no opinion has been written, in my judgment, that is so far-reaching in results and so contradictory to all law, constitutional, statutory and judicial, as in this case.

Believing that my brethren have not realized the extent to which they have gone and the error into which they have fallen, I have written so that attention may be called sharply to the prevailing opinion in this case and its effect, and with the hope that it may not be followed.

Discussing the above matters, except incidentally, I have not mentioned there are expressions in the opinion of the majority in the Napoleon case, *supra,* which were not called for and are but obiter dictum. There are many other reasons, in my judgment, why the majority opinion is wrong, but I have already written beyond what I intended or even what might be necessary.

In closing this dissent I wish to acknowledge my indebtedness to and great appreciation of the masterful and exhaustive argument of Messrs. Martin & Zimmermann, L. C. Penry and A. L. Love, attorneys for applicant. My investigation of the questions involved has been greatly aided by their brief and argument. They have shown great ability, painstaking research and consummate skill in treating the questions presented for revision. The reporter will report their argument on motion for rehearing as fully as the rules will permit.